1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

12

13

14

15

16

| | |
|---|---|
| JACQ NIENABER, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>      v.<br><br>OVERLAKE HOSPITAL MEDICAL CENTER,<br><br>               Defendant. | CASE NO. 2:23-cv-01159-TL<br><br>ORDER ON MOTION TO DISMISS |

17

18

19

20

       This matter is before the Court on Defendant Overlake Hospital Medical Center's Motion

to Dismiss under Rule 12(b)(6). Dkt. No. 17. Having considered Plaintiff's opposition (Dkt.

No. 21) and Defendant's reply (Dkt. No. 22), and finding oral argument unnecessary, the Court

GRANTS the motion with leave for Plaintiff to amend her complaint.

21

## I.      BACKGROUND

22

23

24

       The facts alleged in Plaintiff's Class Action Complaint ("Complaint"), which the Court

takes as true for the purposes of this Order, are as follows: Plaintiff Jacq Nienaber is a citizen of

Washington State and a current patient of Defendant Overlake Hospital Medical Center

1  ("Overlake"). Dkt. No. 1 ¶¶ 35–36. Overlake is a nonprofit healthcare organization

2  headquartered in Bellevue, Washington. *Id.* ¶ 43.

3      Defendant owns and controls two separate websites used by Plaintiff: (1) a public

4  website, www.overlakehospital.org (Defendant's "Public Website"), through which patients can

5  access information about various conditions and treatments, Overlake's locations and

6  practitioners, and other general information about Overlake; and (2) the MyChart Patient Portal,

7  https://mychart.overlakehospital.org/MyChart/Authentication/Login (Defendant's "Private

8  Patient Portal" or "MyChart"), where, among other features, patients can input their real time

9  symptoms and experiences and receive feedback based on the medical information they supply.

10 Dkt. No. 1 ¶ 2. As is evident from the link to the website, a patient must log in to use

11 Defendant's MyChart, which requires a username and password for access. *Id.* ¶ 2 n.1. Plaintiff

12 refers to both Defendant's Public Website and Private Patient Portal collectively as the

13 "'Website'" throughout the Complaint. *Id.* ¶ 2.

14      Through Defendant's Public Website, patients can access "information about various

15 conditions and treatments, Overlake's numerous locations and the practitioners at each location,

16 and other general information about Overlake and the services it offers to its patients." *Id.* ¶ 2.

17 Once logged into MyChart, patients can "input their real time symptoms and experiences on the

18 Website and receive feedback based on the medical information they supply."[1] *Id.* Plaintiff

19 alleges that she used Defendant's Website "numerous times" since 2019 to "request and schedule

20 appointments, communicate with healthcare professionals, complete medical forms, and request

21 and review healthcare and billing records." *Id.* ¶¶ 36–37.

22

23

24 [1] While the Complaint generally refers to the Website, Plaintiff specifically footnotes Defendant's Private Patient Portal for these particular functions. Dkt. No. 1 ¶ 2 n.1.

1    Plaintiff alleges that Defendant installed and implemented browser plugins—including

2    the Facebook Tracking Pixel ("Pixel") and Conversions Application Programming Interface

3    ("Conversions API"), as well as the Google Tag Manager tool—on "its Website," which

4    "secretly enabled" the unauthorized transmission and disclosure of information.[2] *Id.* ¶¶ 3–5, 99.

5    The Pixel tracks the people visiting a website and the types of actions that they take,

6    including "how long a person spends on a particular web page, which buttons the person clicks,

7    which pages they view, [and] the text or phrases they type into various portions of the website

8    (such as a general search bar, chat feature, or text box)." *Id.* ¶ 9. "These intercepted

9    communications, intended solely for Defendant, are then transmitted to third parties, including

10   Facebook and Google." *Id.* ¶ 68. The Conversions API also tracks a website user's "website

11   interaction, including Private Information, and then transmits this data to Facebook." *Id.* ¶ 19.

12   The data transmitted includes Plaintiff's and Class Members' "health conditions; [] desired

13   medical treatment or therapies; and [] phrases and search queries (such as searches for

14   symptoms, treatment options, or types of providers." *Id.* ¶ 86. Further, the Pixel additionally

15   transmits website users' Facebook ID, "thereby allowing individual patients' communications

16   with Defendant, and the Private Information contained in those communications, to be linked to

17   their unique Facebook accounts and therefore their identity." *Id.* ¶ 87. The Google Tag Manager

18   tool transmits search phrases typed into the general search bar located on Defendant's home page

19   to Google. *Id.* ¶¶ 99–100.

20   Plaintiff reasonably expected that her online communications with Defendant were solely

21   between herself and Defendant, expected Defendant would safeguard her private information

22   based on Defendant's privacy policies, and did not consent to the use of her private information

23
24   ---
     [2] Plaintiff asserts, and the Court acknowledges, that "there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like the Conversions API without access to the host server." *Id.* ¶ 71.

by third parties. *Id.* ¶¶ 38–39. Plaintiff is a Facebook user and alleges that "shortly after using Defendant's Website, Plaintiff has seen numerous targeted advertisements on Facebook related to her medical conditions and treatments sought through Overlake." *Id.* ¶¶ 41–42.

Plaintiff contends that Defendant's transmissions of information via the Pixel, Conversions API, and Google Tag Manager are in violation of its own privacy policies, HIPAA standards, and industry standards. *Id.* ¶¶ 104–08 (privacy policies), 109–15 (HIPAA standards), 116–20 (industry standards). Defendant's privacy policies state that "[a]ny information submitted by users of the Sites is for the exclusive use of Overlake Medical Center and Clinics as well as our contractors that are involved in the operation of Overlake Medical Center and Clinics' activities and website operations" *Id.* ¶ 106. And the policies purport to enumerate the ways in which Defendant will use and disclose patients' medical information, none of which, Plaintiff says, cover disclosure to third parties for marketing purposes. *Id.* ¶ 107. Plaintiff also looks to guidance from the Department of Health and Human Services, which indicates that patient status and other identifying information are protected information under HIPAA. *Id.* ¶¶ 110–13. Finally, Plaintiff points to various AMA Code of Medical Ethics Opinions concerning the privacy of patient data and communications that she alleges Defendant failed to abide by as evidence that Defendant violated industry standards. *Id.* ¶¶ 118–20.

## II.   Legal Standard

A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a FRCP 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are

insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023) (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). A revised complaint would replace the current complaint. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 925 (9th Cir. 2012) (en banc) ("the general rule is that an amended complaint supersedes the original complaint and renders it without legal effect").

## III.    DISCUSSION

### A.    Plaintiff Does Not Allege the Disclosure of Personally Identifiable Information or Protected Health Information

In this case, Plaintiff alleges that Defendant misuses Plaintiff's and other website users' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information"). Dkt. No. 1 ¶ 1. The principal theory of Plaintiff's case, underlying all claims, is that Defendant transmits the Private Information that patients input into Defendant's websites to third parties without patients' consent. However, throughout the complaint, Plaintiff refers to Defendant's Public Website and Private Patient Portal collectively as "the Website." Dkt. No. 1 ¶ 2.

1    As other courts within this Circuit have acknowledged, the transmission of information

2    submitted to a *private patient portal*—such as a user clicking on the "log in" button on that

3    webpage—reveals patient status, which in and of itself is protected health information. *See, e.g.*,

4    *In re Meta Pixel Healthcare Litigation* (*In re Meta Pixel I*), 647 F. Supp. 3d 778, 791–93 (N.D.

5    Cal. 2022); *Cousin v. Sharp Healthcare* (*Cousin I*), 681 F. Supp. 3d 1117, 1123–24 (S.D. Cal.

6    July 12, 2023). The collection and transmission of information from *unauthenticated* web pages

7    (*i.e.*, pages that do not require a user to log in to access the website) may be actionable as well if

8    the information disclosed demonstrates that the plaintiff's interactions plausibly relate to the

9    provision of healthcare, or if the information connects a particular user to a particular healthcare

10   provider (*i.e.*, patient status). *See Cousin v. Sharp Healthcare* (*Cousin II*), No. C22-2040, 2023

11   WL 8007350, *2–3 (S.D. Cal. Nov. 17, 2023); *In re Meta Pixel I*, 647 F. Supp. 3d at 793; *In re*

12   *Meta Healthcare Pixel Litigation* (*In re Meta Pixel II*), No. C22-3580, 2024 WL 333883, *2–3

13   (N.D. Cal. Jan. 29, 2024). However, where nothing but browsing activity on a publicly available

14   website is transmitted, courts within this circuit have held that "the URLs, or the content of the

15   pages located at those URLs, [do not relate] 'to the past, present, or future physical or mental

16   health or condition of an individual.'" *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D.

17   Cal. 2017) (quoting 45 C.F.R. § 160.103), *aff'd* 745 F. App'x 8 (9th Cir. 2018); *see also Cousin*

18   *I*, 681 F. Supp. 3d at 1123.

19   Defendant argues that Plaintiff only makes allegations about "public website browsing,"

20   and that Plaintiff cannot maintain her claims to the extent that they are based upon the theory that

21   Defendant's sharing of Plaintiff's browsing activity constitutes sharing of Private Information.

22   Dkt. No. 17 at 13. Thus, whether the allegations concern Defendant's Public Website or Private

23   Patient Portal may make a significant difference.

24

### 1.    Defendant's Private Patient Portal

There are only two sentences in Plaintiff's Complaint that describe her actual engagement with Defendant's websites: (1) "Plaintiff used [Defendant's] Website to find and obtain medical treatment," Dkt. No. 1 ¶ 35; and (2) "Plaintiff [ ] used Defendant's Website to conduct the following activities: request and schedule appointments, communicate with healthcare professionals, complete medical forms, and request and review healthcare and billing records." *Id.* ¶ 37. Except for requesting and scheduling appointments, it appears the other actions can only be done while logged in to Defendant's MyChart. While it is not necessary for Plaintiff to provide specific medical details, she must allege more than she has.

In *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813 (N.D. Cal. 2023), upon which Plaintiff relies, the court found that plaintiff's allegations survived a motion to dismiss where:

> [Plaintiff] entered medical information, including information relating to her heart issues and high blood pressure, into the patient portal . . . . that UC Regents intentionally incorporated Meta Pixel on the UCSF website and password protected MyChart portal, disclosing and allowing Meta to intercept her and class members' data . . . . that *after she entered her information into UCSF's patient portal*, she began receiving advertisements on Facebook for high blood pressure medication as well as targeted email advertisements relating to the same . . . . [and] that she used the same email address to register for both her MyChart and her Facebook account, [providing] a plausible means by which her information could be matched to her Facebook profile.

*Id.* at 819 (emphasis added). Here, Plaintiff vaguely states that she "communicate[d] with healthcare professionals" and "complete[d] medical forms." Dkt. No. 1 ¶ 37. However, Plaintiff makes no allegations as to the type of information she provided to Defendant through MyChart or that Defendant transmitted Private Information *of hers* to third parties through the Private Patient Portal. *See* Dkt. No. 1 ¶¶ 36–42. Indeed, Plaintiff does not even clearly allege whether

she used MyChart or the Public Website to request or schedule appointments. *See id.* Instead, the Complaint discusses a hypothetical example of a patient scheduling an appointment where the user is then directed to communicate information including the type of medicine being sought and the type of appointment being scheduled. *Id.* ¶ 90. But Plaintiff neither alleges that *she* tried to schedule an appointment through MyChart nor that *she* entered the type of medicine she sought or the type of appointment being scheduled (which would undoubtedly be protected health information), or that the Pixel transmitted *her* information to Facebook. *See id.* ¶¶ 90–98. All of these types of information are easily and clearly within Plaintiff's control, and Plaintiff cannot maintain her theory of the case as to the MyChart website absent concrete factual allegations that her Private Information entered on Defendant's Private Patient Portal was disclosed.

Further, in giving an example of using the website to schedule an appointment, Plaintiff includes one image from a generic MyChart page. *Id.* ¶ 90. Plaintiff clearly tries to suggest she browsed Defendant's Private Patient Portal and that Private Information from it was transmitted to third parties. But the examples given to try to establish disclosure only relate to Defendant's Public Website, where a patient may also schedule an appointment. *Id.* ¶¶ 75, 94, and 97. All three of the examples are clearly tied to www.overlakehospital.org, and the examples given of the information sent to Facebook are from the Public Website appointments page, not the MyChart page. *Id.* ¶¶ 94, 97. Plaintiff claims that "this particular webpage"—referring to the MyChart image in Paragraph 90—contains Defendant's Pixel. *Id.* ¶ 93. However, the very next paragraph that is supposed to show Defendant's Pixel on the webpage is from Defendant's Public Website.[3] *Id.* ¶ 94.

---

[3] Given the examples Plaintiff provides with her Complaint, it appears she could also provide the same information with regard to Defendant's Private Patient Portal.

Plaintiff's response brief only addresses whether disclosures made from browsing a public website may be actionable and not whether they allege any information was disclosed from the Private Patient Portal. Dkt. No. 21 at 11–12. The skeletal information in the Complaint leads the Court to agree with Defendant that Plaintiff only makes allegations regarding Private Information being disclosed from Defendant's Public Website.

### 2.   Defendant's Public Website

Disclosure through publicly available webpages that, plausibly relate to the provision of healthcare or connect a particular user to a particular healthcare provider may be actionable. *Cousin II*, 2023 WL 8007350, at \*2–3; *In re Meta Pixel I*, 647 F. Supp. 3d at 793; *In re Meta Pixel II*, 2024 WL 333883, at \*2–3. However, in the case at hand, Plaintiff does not make sufficient factual allegations to demonstrate that any such information was transmitted to third parties by Defendant through its Public Website. Plaintiff alleges that she used Defendant's website to request and schedule appointments. Dkt. No. 1 ¶ 37. But Plaintiff provides no additional factual information tying her actual activities to the allegations made by the hypothetical purportedly demonstrating disclosure of Private Information. For example, Plaintiff provides no information as to whether she used Defendant's Public Website to schedule an appointment or regarding what information she entered on Defendant's Public Website containing information-sharing browser plugins. *See generally* Dkt. No. 1 ¶¶ 37, 75, 90–98.

Further, the disclosure of browsing activity on a publicly available website that does not relate "'to the past, present, or future physical or mental health or condition of an individual'" is not actionable. *See Smith*, 262 F. Supp. 3d at 954–55 (quoting 45 C.F.R. § 160.103). The example given in the Complaint only shows that the fact that a user viewed the "Schedule an Appointment" page on Defendant's Public Website was disclosed to a third party. Dkt. No. 1 ¶¶ 94, 96. Plaintiff also alleges that when a patient uses the general search bar located on

Defendant's website homepage, the exact text and phrases typed by the user are transmitted to

Google via the Google Tag Manager. *Id.* ¶¶ 99–102. But the example given simply shows a

search on Defendant's Public Website for the word "cancer" which pulled up generic

information regarding certain services and general information on prostate cancer. *Id.* ¶¶ 99–101.

Plaintiff does not allege that the text and phrases are transmitted in addition to any information

identifying the user as a patient, nor does she make specific allegations as to her use of this

general search bar. *See id.* ¶¶ 37, 99–102. Plaintiff contends that *Doe v. Bon Secours Mercy

Health*, No. C20-2633, 2021 WL 9939010 (Ohio C.P. Nov. 22, 2021) supports her contention

that allegations of public browsing activity are actionable. *See* Dkt. No. 21 at 11. But in *Bon

Secours*, the plaintiff had made allegations that "the information disclosed to third parties

includes the fact that a visitor to defendant's [public] website is a patient of defendant." *Bon

Secours*, 2021 WL 9939010, at *2. Plaintiff here makes no such allegations.

      In any event, courts have dismissed similar allegations regarding hypothetical examples

of data sharing. The Central District of California recently dismissed comparable privacy claims

where:

> Plaintiffs fail to allege what, if any, medical information or
> medical records were transmitted or disclosed. Notably, Plaintiffs'
> Complaint is 90 pages long but includes less than four pages of
> vague allegations about Plaintiffs and their experiences with
> Defendant. The Complaint is replete with conjectures and
> hypothetical scenarios and patients. Plaintiffs fail to allege any
> specificity as to what medical information was allegedly disclosed
> or when it was disclosed. B.K. states she started using the Website
> over three years ago and started receiving unsolicited ads "shortly
> after" but provides no more information about the alleged
> disclosures. N.Z. alleges the same pattern but states that it occurred
> "over seven years ago."

1    *B.K. v. Eisenhower Medical Center*, No. C23-2092, 2024 WL 878100, at *4 (C.D. Cal. Fed. 29,

2    2024) (internal citations omitted). The Northern District of Illinois ruled similarly in another

3    healthcare provider data-sharing case, holding:

> Kurowski's allegations are far too vague to allow an inference to be
> drawn that Rush was actually disclosing IIHI as it is
> unambiguously defined by HIPAA, rather than just metadata.
> Kurowski contends that it would be unreasonable to expect her to
> disclose that type of intimate information in her complaint. But
> that contention lacks merit. Kurowski could have requested to file
> the complaint under seal. Moreover, Kurowski cannot reasonably
> expect to bring a lawsuit related to the invasion of her medical
> privacy and completely evade revealing what it is that she alleges
> Rush disclosed to third parties.

*Kurowski v. Rush System for Health* (*Kurowski II*), 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023);

*see also Kurowski v. Rush System for Health* (*Kurowski III*), No. C22-5380, 2023 WL 8544084,

at *3 (N.D. Ill. Dec. 11, 2023) (holding that claims survived after complaint was amended to

include "additional factual allegations regarding the information [plaintiff] contends was

transmitted to third parties with Rush's knowledge"). Here, Plaintiff's two sentences of specific

allegations coupled with the hypotheticals offered is simply not enough.

That is not to say that interactions on publicly available websites cannot constitute PHI.

To the contrary, in *Cousin*, following the court's dismissal, plaintiffs amended their complaint to

include further allegations about their interactions on defendant's website. *Cousin II*, 2023 WL

8007350, at *1. The court found that:

> Plaintiff Cousin alleges that she used Sharp's website to search for
> a primary care physician. Namely, she filtered the results of
> Sharp's physician directory by, among other things, specialty. This
> just narrowly survives dismissal by demonstrating that her
> interactions plausibly relate to the provision of health care.
> Plaintiffs Camus and Barbat, on the other hand, set forth their
> particular medical conditions and allege that they searched
> Defendant's website for doctors who specialize in these conditions
> and for information about their conditions (i.e., symptoms,
> treatments, procedures). Camus also alleges she booked an

> appointment to obtain treatment for a medical condition. These interactions plausibly convey information about a present medical condition and the provision of medical care covered by HIPAA.

*Id.* at *3 (internal citations omitted); *see also Toy v. Life Line Screening of Am. LTD*, No. C23-4651, 2024 WL 1701263, at *1 (N.D. Cal. Mar. 19, 2024) ("Toy sufficiently alleges a concrete harm. The complaint alleges that Toy used Life Line's website to order at-home health tests and view her results, and that the URL of the webpage, which contains information about what tests she purchased, were shared without her permission with Facebook via the Facebook Pixel, an invisible tracker that Life Line had embedded in its website."). But Plaintiff has made no allegations of her interactions with Defendant's websites, let alone any allegations showing that her interactions plausibly related to the provision of healthcare or were shared by Defendant. In fact, Plaintiff's allegations as to herself are disconnected from any allegations of information sharing by Defendant. *See, e.g.*, Dkt. No. 1 ¶ 37. Her claims cannot survive absent this factual support.

With this in mind, the Court turns to each of Plaintiff's class-wide claims.

**B.    Count I: Negligence**

Plaintiff brings a claim for negligence on behalf of herself and of the putative national class. Dkt. No. 1 ¶¶ 154–65. Defendant contends that Plaintiff has failed to establish duty, breach, and cognizable damages, and that the negligence claims is otherwise barred by the economic loss rule. Dkt. No. 17 at 13–14.

Under Washington law, negligence requires "(1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of that injury." *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1156 (W.D. Wash. 2017) (citing *Degal v. Majestic Mobile Manor*, 129 Wn.2d 43, 914 P.2d 728, 731 (1996)). "The existence of a duty 'is a question of law and depends on mixed considerations of logic, common

sense, justice, policy, and precedent.'" *Id.* (quoting *Snyder v. Med. Serv. Corp.*, 145 Wn.2d 233, 35 P.3d 1158, 1164 (2001)). Duty may be predicated "on violation of statute or of common law principles of negligence." *Id.* (quoting *Jackson v. City of Seattle*, 158 Wn. App. 647, 244 P.3d 425, 428 (2010)). Plaintiff alleges that Defendant owed a duty of care to Plaintiff and the putative national class to keep their PHI confidential because Defendant is a health care provider under the Health Care Information Act ("HCIA"), and because Defendant's own privacy policy establishes that it owes a duty to Plaintiff. Dkt. No. 21 at 12–14. Defendant primarily relies upon its argument that Plaintiff's allegations are limited to public browsing activity, arguing that there is no duty to protect such activity. Dkt. No. 22 at 7.

Plaintiff first argues that "as a health care provider, Defendant owes a duty to keep health care information confidential under the Health Care Information Act ("HCIA")." Dkt. No. 21 at 12. To determine whether a duty of care exists based upon a statutory violation, Washington courts have adopted the Restatement test, which "requires that the injured person be within the class of persons the statute was enacted to protect," the particular interest of the plaintiff be within the scope of the interest protected by the statute, the harm be the kind the statute was enacted to protect, and the hazard causing the harm be the type the statute was enacted to protect. *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 474–75, 951 P.2d 749 (1998) (citing *Hansen v. Friend*, 118 Wn.2d 476, 480, 824 P.2d 483 (1992)); Rest. 2d Torts § 286. The legislative findings accompanying the HCIA state that "[i]n order to retain the full trust and confidence of patients, health care providers have an interest in assuring that health care information is not improperly disclosed and in having clear and certain rules for the disclosure of health care information." RCW 70.02.005. "Health care information" as defined under the HCIA, is "any information . . . that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.20. Plaintiff here is a patient

of Defendant (Dkt. No. 1 ¶ 36) and is thus within the class of persons that the HCIA was enacted to protect. Further, the willful disclosure of health care information is the type of harm the HCIA was enacted to protect. *See Seattle Children's Hospital v. King County*, 16 Wn. App. 2d 365, 483 P.3d 785, 794 (2020) ("The HCIA recognizes that '[h]ealth care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests.'" (quoting RCW 70.02.005(1)) (alteration in original)). Plaintiff has therefore alleged a duty under the HCIA.

Plaintiff also argues that Defendant's own privacy policy establishes a duty to Plaintiff. *See, e.g.*, Dkt. No. 21 at 13–14; Dkt. No. 1 ¶¶ 106–08. Defendant's online privacy notice states:

> [a]ny information submitted by users of the Sites is for the exclusive use of Overlake Medical Center and Clinics as well as our contractors that are involved in the operation of Overlake Medical Center and Clinics' activities and website operation . . . . We will not share your information with any third party outside of our organization unless the third party provides services on our behalf . . . or if it is required by law."

Dkt. No. 1 ¶ 106. Defendant does not appear to dispute that its privacy policy establishes a duty to safeguard PHI but argues that the Complaint only alleges the disclosure of public website browsing data. Dkt. No. 22 at 7.

Finally, Plaintiff argues that Defendant's alleged misfeasance creates a duty to Plaintiff. *See* Dkt. No. 21 at 13–14. "Washington courts have held that 'a duty to guard against a third party's foreseeable criminal conduct exists where an actor's own affirmative act has created or exposed another to a recognizable high degree of risk of harm through such misconduct, which a reasonable person would have taken into account.'" *Buckley v. Santander Consumer USA, Inc.*, No. C17-5813, 2018 WL 1532671, at *5 (W.D. Wash. Mar. 29, 2018) (quoting *Parilla v. King County*, 138 Wn. App. 427, 439, 157 P.3d 879 (2007)). "Under such a theory, it is necessary that the defendant have engaged in some 'misfeasance,' which 'necessarily entails the creation of a

new risk of harm to the plaintiff.'" *Id.* (quoting *Robb v. City of Seattle*, 176 Wn.2d 427, 437, 295 P.3d 212 (2013)). The intentional disclosure of personal information by Defendant to an unauthorized third party, as Plaintiff has alleged, constitutes an affirmative act, or misfeasance. *See id.* "It is foreseeable that providing a customer's private information . . . creates a new risk of harm to the customer, particularly of identity theft or other fraudulent schemes based on the exploitation of such data." *Id.* Plaintiff has thus alleged a duty under the misfeasance theory.

      While Plaintiff establishes the existence of a duty, satisfying the first prong of the negligence analysis, Plaintiff fails to allege facts sufficient to establish a breach of that duty. As detailed above, Plaintiff has not made specific allegations as to what information she gave to Defendant, and what information Defendant in turn shared with third parties, nor has she alleged that Defendant shared information that can be used to readily identify her. *See* Dkt. No. 1 ¶¶ 7, 35–42, 50–103, 123–31, 246. While Plaintiff has made hypothetical allegations of information-sharing, Plaintiff must plead facts showing (or supporting the inference) that *her* PHI was shared with Defendant and by Defendant to third parties. Plaintiff has therefore not alleged a breach of Defendant's duty to safeguard PHI under the HCIA, its privacy policy, or the misfeasance theories of duty. For this reason, Plaintiff's negligence claim fails.

      As it seems likely plaintiff will be able to properly amend her complaint, the Court finds it worthwhile to address the Parties' arguments regarding damages. Plaintiff argues that she adequately alleges damages in the form of the diminished value of her sensitive health and personal information.[4] Dkt. No. 21 at 14–15. Defendant contends that Plaintiff must "plead facts showing that she lost the opportunity to sell her information or that the value of [her] information was somehow diminished after it was collected by Facebook," or "recover on an overpayment

---

[4] Plaintiff's Complaint only asserts that "Plaintiff and Class Members are entitled to nominal, punitive, compensatory and/or consequential damages suffered as a result of the Data Breach." Dkt. No. 1 ¶ 164.

theory." Dkt. No. 17 at 14. Plaintiff is correct that damages are adequately alleged where a plaintiff alleges "a heightened risk of future identity theft, loss of privacy with respect to highly sensitive information, loss of time, and risk of embarrassment," rather than pure economic damages. *Flores-Mendez v. Zoosk, Inc.*, No. C20-4929, 2021 WL 308543, at \*3–4 (N.D. Cal. Jan. 30, 2021). However, Plaintiff has alleged no such facts in her Complaint and, therefore, has not alleged any damages.

For the foregoing reasons, Plaintiff's negligence claim is DISMISSED with leave to amend.

## C.    Count II: Invasion of Privacy

Plaintiff brings a claim for invasion of privacy on behalf of herself and the putative national class. Dkt. No. 1 ¶¶ 166–79. "Washington common law recognizes a 'protectable interest in privacy [that] is generally held to involve four distinct types of invasion: intrusion, disclosure, false light and appropriation.'" *Buckley v. Santander Consumer USA, Inc.*, No. C17-5813, 2018 WL 1532671 (W.D. Wash. Mar. 29, 2018) (quoting *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 469, 722 P.2d 1295 (1986)); *see also Armijo v. Yakima*, No. C11-3114, 2012 WL 2576624, \*2 (E.D. Wash. July 3, 2012). Plaintiff argues that she prevails under both an intrusion upon seclusion and a public disclosure of private facts theory of her claim. Dkt. No. 21 at 15.

### 1.    Intrusion Upon Seclusion

"To prevail on an intrusion on seclusion claim, a plaintiff must prove that the defendant (1) deliberately intruded; (2) into the plaintiff's solitude, seclusion, or private affairs; (3) in a manner that would be highly offensive to a reasonable person." *Armijo*, 2012 WL 2576624, at \*2 (citing *Fisher v. State ex rel. Dep't of Health*, 125 Wn. App. 869, 106 P.3d 836 (2005)). "Invasion of privacy by intrusion consists of a deliberate intrusion, physical or otherwise, into a person's solitude, seclusion, or private affairs." *Fisher*, 106 P.3d at 840; *see also Poore-Rando v.*

1  *United States*, No. C16-5094, 2017 WL 5756871, at *2 (W.D. Wash. Nov. 28, 2017) ('[A]n actor

2  commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the

3  necessary legal or personal permission to commit the intrusive act.") (quoting *O'Donnell v.*

4  *United States*, 891 F.2d 1079, 1083 (3d Cir. 1989) (alteration in original)).

5      Plaintiff contends that "Defendant intruded upon her seclusion by deliberately planting a

6  bug on her web browser that surreptitiously forced her to duplicate her communications with

7  Defendant and disclose them to Facebook, Google, and other third parties." Dkt. No. 21 at 15–

8  16. Defendant primarily relies on *Kurowski v. Rush System for Health* (*Kurowski I*), 659 F. Supp.

9  3d 931 (N.D. Ill. 2023), to argue that "the alleged intrusion, if any, was carried out by a third

10  party" and is therefore not actionable against Defendant. Dkt. No. 17 at 15.[5]

11      *Kurowski I* addressed an invasion of privacy claim under Illinois common law where the

12  plaintiff alleged "that Rush [(a university hospital system)] intruded by deploying third-party

13  source code that caused personally identifiable patient data to be disclosed to third parties." 659

14  F. Supp. 3d at 943. Like Washington, Illinois recognizes a common law action for invasion of

15  privacy by intrusion upon seclusion, and similarly describes the "core of [the] tort" as "the

16  offensive prying into the privacy domain of another." *Id.*; *see also Fisher*, 106 P.3d at 840

17  ("Invasion of privacy by intrusion *consists of a deliberate intrusion*, physical or otherwise, into a

18  person's solitude, seclusion, or private affairs." (emphasis added)). The *Kurowski I* court

19  determined that "the core of [plaintiff's] claim is Rush's deployment of third-party source code

20  that causes the transmission of patient data"—"[i]n other words, the harm for which Rush is

21  responsible, if any, is its disclosure of patient data[ . . . ,] not the obtaining of that data." 659 F.

22  Supp. 3d at 943–44. The Court finds this reasoning persuasive. Plaintiff's claim for invasion of

23  _____

24  [5] Plaintiff contends that *Kurowski I*'s holding is "contrary to caselaw from within the Ninth Circuit." Dkt. No. 21
   at 17. But Plaintiff cites to no caselaw supporting this proposition. *Id.*

privacy is rooted in her allegations that she willfully shared private information with Defendant, which Defendant then shared with third parties. *See generally* Dkt. No. 1. Because Plaintiff voluntarily shared her information with Defendant, there was no *intrusion* upon Plaintiff's solitude, seclusion, or private affairs by Defendant. *See Buckley*, 2018 WL 1532671, at *7 ("Because Santander allegedly financed Buckley's vehicle purchase, Santander possessed the necessary legal permission to acquire Buckley's personal information. To the extent that Buckley complains that Santander deliberately passed this information along to an unauthorized third party, that is not a claim for intrusion but rather disclosure."). Contrary to Plaintiff's argument, this does not serve to imply that "the postal service could let strangers on the street open someone's outgoing mail" (Dkt. No. 21 at 17), it only means that such an act would not be actionable as an invasion of privacy claim under the specific theory of intrusion upon seclusion.

### 2.    Public Disclosure of Private Facts

"To prevail on a public disclosure of private facts claim, a plaintiff must prove that the defendant (1) intentionally disclosed private facts; (2) that were not of legitimate concern to the public; (3) which disclosure would be highly offensive to a reasonable person." *Armijo*, 2012 WL 2576624, at *2 (citing *Adams v. King County*, 164 Wn.2d 640, 192 P.2d 891 (2008)). "This cause of action is distinguished from the tort of intrusion upon seclusion in that 'publicity is an essential element [of] an action based upon the defendant's public disclosure of private facts.'" *Id.* (quoting David K. DeWolf & Keller W. Allen, 16A *Washington Practice Series* § 20.5 (3d ed.)) (alteration in original). "Publicity . . . means communication to the public at large so that the matter is substantially certain to become public knowledge . . . ; communication to a single person or a small group does not qualify." *Fisher*, 106 P.3d at 840–41.

Plaintiff argues that she succeeds on the "publication" theory of invasion of privacy because Defendant "has taken information that is private and shown it to some of the world's

largest advertising companies, who use it for targeted marketing and advertising Plaintiff did not authorize." Dkt. No. 21 at 17. Defendant contends that Plaintiff's claim under this theory fails because Plaintiff does not allege that the communication was to the public at large. Dkt. No. 22 at 9. Defendant further argues that Plaintiff has failed to allege any conduct that is "highly offensive" to a person with ordinary sensibilities. Dkt. No. 17 at 16.

"[P]ublicity for the purposes of [a public disclosure of private facts claim] means communication to the public at large so that the matter is substantially certain to become public knowledge." *Fisher*, 106 P.2d at 840–41. "[C]ommunication to a single person or a small group does not qualify." *Id.* at 841. The disclosure of PHI or PII to Facebook and Google, as Plaintiff alleges, does not meet this standard of publicity. *See In re MCG Health Data Security Issue Litigation*, No. C22-0849, 2023 WL 3057428, at *6 (W.D. Wash. Mar. 27, 2023) ("Plaintiffs allege that cybercriminals obtained the information. There are no allegations that MCG Health publicized Plaintiffs' private information to more than a small group of people."); *Buckley*, 2018 WL 1532671, at *7 (holding that pleadings lacked necessary allegations to support publicity element where plaintiff alleged disclosure of personal information to a third party). While Plaintiff makes conclusory allegations that Facebook sells the Private Information it obtains from Defendant to additional third-party marketers (Dkt. No. 1 ¶ 22), she does not offer any factual support for these claims, nor does she identify any specific marketers that she believes are in receipt of her information. Further, Plaintiff does not allege that the information shared by Defendant will become available to the public *at large*; to the contrary, Plaintiff alleges that the information is shared with Facebook and, in turn, is being used by Facebook to target Plaintiff herself. *See* Dkt. No. 1 ¶¶ 30, 31, 42.

Even if the alleged disclosure was considered public disclosure, Plaintiff has not adequately identified the personal PHI she alleges was publicized for the Court to determine

1  whether any such disclosure would be highly offensive to a person with ordinary sensibilities.

2  *See, e.g.*, *Reid v. Pierce County*, 136 Wn.2d 195, 961 P.2d 333 (1998) (holding that disclosure of

3  autopsy records and photographs of a relative would be highly offensive to a person with

4  ordinary sensibilities).

5       For the foregoing reasons, Plaintiff's invasion of privacy claim is DISMISSED with leave to

6  amend.

7  **D.    Count III: Breach of Confidence**

8       Plaintiff brings a claim for breach of confidence on behalf of herself and the putative

9  national class. Dkt. No. 1 at 41–42. Defendant contends that breach of confidence is not

10  recognized as a common law cause of action under Washington law. Dkt. No. 17 at 18.

11       As Defendant correctly states, Washington has not recognized breach of confidence as a

12  common law cause of action. *Snapp v. Burlington Northern Santa Fe Ry.*, No. C10-5577, 2012

13  WL 3157137, at *4–5 (W.D. Wash. Aug. 3, 2012) (citing *Hines v. Todd Pacific Shipyards Corp.*,

14  127 Wn. App. 356, 112 P.3d 522 (2005)), *overturned on other grounds by Snapp v. United*

15  *Transp. Union*, 547 F. App'x 824 (9th Cir. 2013). While Washington does recognize "a cause of

16  action against a physician for unauthorized disclosure of privileged information" under Chapters

17  7.70 and 70.02 of the Revised Code of Washington, *Berger v. Sonneland*, 144 Wn.2d 91, 105–

18  07, 26 P.3d 257, 265–66 (2001), those are statutory claims distinct from the common law breach

19  of confidence claim that Plaintiff brings.

20       For the foregoing reasons, Plaintiff's breach of confidence claim is DISMISSED.

21  **E.    Count IV: Breach of Implied Contract**

22       Plaintiff brings a claim for breach of implied contract on behalf of herself and the

23  putative national class. Dkt. No. 1 ¶¶ 188–94. Defendant argues that Plaintiff fails to plead facts

24

showing mutual assent and consideration, and that its privacy policy does not give rise to a breach of contract. Dkt. No. 17 at 10.

"To prevail on a breach of implied contract claim, a plaintiff must demonstrate that [an] implied contract exists based on the acts of the parties involved and in light of the surrounding circumstances." *Leslie v. Fidelity Nat. Title Ins. Co.*, 598 F. Supp. 2d 1176, 1184 (W.D. Wash. 2009) (citing *Caughlan v. Int'l Longshoremen's and Warehousemen's Union*, 52 Wn.2d 656, 328 P.2d 707 (1958)). Washington recognizes two classes of implied contracts: those implied in fact, and those implied in law. *Young v. Young*, 164 Wn.2d 477, 191 P.3d 1258 (2008) (citing *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 137 P.2d 97 (1943)). Plaintiff alleges a contract implied in fact. Dkt. No. 21 at 18.

A contract implied in fact "requires mutual assent of the parties, but a trial court may 'deduce mutual assent from the circumstances, whereby the court infers a contract based on a course of dealings between the parties or a common understanding within a particular commercial setting.'" *Leslie*, 598 F. Supp. 2d at 1184 (quoting *Hoglund v. Meeks*, 139 Wn. App. 854, 870–71, 170 P.3d 37 (2007)). "Whether parties manifested mutual assent to form a contract is generally a factual question." *Id.* (quoting *Hoglund*, 139 Wn. App. at 871).

Plaintiff contends that when she and the other putative class members "provided their user data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent." Dkt. No. 1 ¶ 189. However, these facts are insufficient to allege the existence of an implied contract. As Plaintiff acknowledges, "[t]he services [giving rise to the contract] must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them." *Johnson v. Nasi*, 50 Wn.2d 87, 91, 309 P.2d 380 (1957); Dkt. No. 21 at 18. But Plaintiff has made no

allegations that she paid Defendant for any medical services, nor has she made any additional allegations regarding any consideration received by Defendant for its promise to safeguard Plaintiff's information. *See* Dkt. No. 1 ¶¶ 35–42, 188–94. Plaintiff therefore fails to allege the existence of a valid contract supported by mutual assent and consideration.

In each of the cases that Plaintiff relies on, the court pointed to more substantial allegations that it held supported the existence of an implied contract. For example, in *Doe v. Boone Health, Inc.*, the court held the plaintiff had adequately stated a claim for an implied-in-fact contract where:

> Plaintiff alleges that Defendants manifested an implicit promise to provide medical services, to institute reasonable measures to protect the confidentiality of his medical information, and to institute reasonable policies, procedures, and training programs to educate its employees about protecting the confidentiality of patients' personal health information. Plaintiff further alleges that Defendants *solicited and received consideration from Plaintiff for this implicit promise, including monies paid for medical services and confidential medical information*, and that Defendants breached the parties implied in fact agreement by transmitting personally identifiable, health information to Facebook and Google via tracking tools on its website and failing to develop policies, procedures, processes, and notices to ensure that would not happen.

No. C22-7646, 2023 WL 4996117, at *3 (Mo. Cir. Ct. July 20, 2023) (internal citations omitted) (emphasis added). Similarly, in *Doe v. Regents*, the court held that plaintiff had plausibly alleged the parties had entered into an implied contract where:

> Plaintiff alleges that she and other class members *paid money and provided their User Data to UC Regents in exchange for services*, and that she and class members would not have entrusted UC Regents with their User Data in the absence of an implied contract obligating UC Regents to safeguard that data. She states that UC Regents breached this implied contract by disclosing that information to Meta, a third party. She contends that she would not have paid, or would have paid less, for these services had she known that UCSF would disclose her data.

672 F. Supp. 3d at 821 (emphasis added); *see also C.M. v. MarinHealth Medical Group, Inc.*, No. C23-4179, 2024 WL 217841, at *4 (N.D. Cal. Jan. 19, 2024) ("In contrast, this case arises in the context of *paid* healthcare services and is based on an ongoing relationship between the parties that plaintiff alleges was based in part, or that the amount he paid for the services was based in part, on MarinHealth's security promises. In this context, adequate consideration has been alleged for the implied contract claim." (emphasis in original)). In contrast, Plaintiff here alleges that the provision of user data *alone* to Defendant in exchange for services was sufficient to establish an implied in fact contract. Dkt. No. 1 ¶¶ 189–91. Plaintiff did not even argue that she paid for services in her brief in response to this argument. *See* Dkt. No. 21 at 18–19. And while "[m]any federal courts have held that an implied contract to safeguard customers' sensitive data could reasonably be found to exist in transactions where consumers are solicited or invited to provide personal information in exchange for a good or service," Plaintiff alleges no invitation or solicitation by Defendant indicating that it implicitly assented to secure PHI and PII in exchange for renumeration. *See In re Mednax Services, Inc., Customer Data Security Breach Litigation*, 603 F. Supp. 3d 1183, 1221 (S.D. Fla. 2022). "Plaintiff['s] allegations reveal only that [she] provided [her] personal information as required to receive healthcare services from Defendant[]—not data security services beyond the privacy requirements already imposed on Defendant[] by federal law." *Id.*; *see also* Dkt. No. 1 ¶¶ 188–94.

Plaintiff also argues that Defendant's Notice of Privacy Practices can form the basis of an implied contract. Dkt. No. 21 at 19. However, as the court in *Doe v. Regents* noted, while such policies may form the *terms* of an implied contract, they do not alone serve as an enforceable contract without a separate "meeting of the minds" between the parties. *See* 672 F. Supp. 3d at 821. Because privacy notices serve to inform patients of their rights under federal law and the duties imposed on healthcare providers by these statutory provisions, they are not contractual in

nature. *See In re Mednax*, 603 F. Supp. 3d at 1222 (citing *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359 (S.D. Fla. 2017)). "Because Defendant[ is] required by law to adhere to HIPAA without receiving any consideration from Plaintiff[] or any other patient, these provisions cannot create contractual obligations." *Id.*; *see also Griffey v. Magellan Health Incorporated*, 562 F. Supp. 3d 34, 52 (D. Az. 2021) ("Plaintiffs here fail to allege consideration because they did not allege that Magellan promised to act beyond the existing HIPPA mandates."). Accordingly, the Court cannot infer from Plaintiff's allegations the mutual assent and meeting of the minds required to form an implicit contract for data security services based on the Parties' conduct.

Finally, with respect to damages, Defendant argues that the damages Plaintiff seeks—the lost property value of her personal information (Dkt. No. 21 at 24)—are not recoverable in contract (Dkt. No. 17 at 19). While the Ninth Circuit has not directly addressed this issue, courts in this circuit have dismissed cases where, like here, plaintiff's injury is based on "'the loss of the inherent value of their personal data,' as well as where it was undisputed that plaintiffs paid no money to the defendant." *Eisenhower Med. Ctr.*, 2024 WL 878100, at *6 (quoting *Doe v. Meta Platforms, Inc.*, No. C22-3580, 2023 WL 5837443, at *15 (N.D. Cal. Sept. 7, 2023)); *see also Saeedy v. Microsoft Corp.*, No. C23-1104, 2021 WL 8828852, at *6 (W.D. Wash. Dec. 21, 2023) ("To establish standing for their claims of loss of value in their data as property, Plaintiffs must show that they personally lost money or property as a result of Microsoft's conduct."). Because, as discussed above, Plaintiff has made no allegations that she ever paid Defendant, she has not alleged damages for her breach of contract claim.

For the foregoing reasons, Plaintiff's breach of implied contract claim is DISMISSED with leave to amend.

1    **F.      Count V: Unjust Enrichment**

2          Plaintiff brings a claim for unjust enrichment on behalf of herself and the putative

3    national class. Dkt. No. 1 ¶¶ 195–200. Defendant contends that Plaintiff has failed to plead

4    sufficient facts showing that Defendant received a benefit, that Plaintiff suffered a detriment, and

5    that it would be unjust for Defendant to retain any benefit without payment. Dkt. No. 17 at 20.

6          Unjust enrichment "occurs when one retains money or benefits which in justice and

7    equity belong to another." *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wn. App. 151, 160,

8    810 P.2d 12 (1991). This cause of action "is the method of recovery for the value of the benefit

9    retained absent any contractual relationship because notions of fairness and justice require it."

10   *Young*, 164 Wn.2d at 484 (citing *Bailie Commc'ns*, 61 Wn. App. at 160). To state a claim for

11   unjust enrichment, Plaintiff must show that: (1) Plaintiff conferred a benefit upon Defendant,

12   (2) at Plaintiff's expense, and (3) the circumstances make it unjust for Defendant to retain the

13   benefit without payment. *Young*, 164 Wn.2d at 484.

14         "A person confers a benefit upon another if he gives to the other possession of or some

15   other interest in money, land, chattels, or choses in action, performs services beneficial to or at

16   the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's

17   security or advantage." *Chandler v. Washington Toll Bridge Authority*, 17 Wn.2d 591, 601, 137

18   P.2d 97 (1943). Even though the Court has already determined that Plaintiff has not made

19   sufficient factual allegations as to what information she specifically provided to Defendant, the

20   provision of any PHI to Defendant would be sufficient to confer a benefit. *See Boone Health*,

21   2023 WL 4996117, at *4 (finding that plaintiff had conferred a benefit on defendants in the form

22   of valuable and confidential medical information); *see also In re Capital One Consumer Data*

23   *Security Breach Litig.*, 488 F. Supp. 3d 374, 412–13 (E.D. Va. 2020) (finding that benefit was

24   conferred to Amazon where it "profited from its storage and retention of Plaintiffs' PII").

That said, Plaintiff fails to adequately plead either a concrete detriment or that the circumstances in this case make it unjust for Defendant to retain any benefit conferred. Plaintiff generically contends that she "suffered from: '(i) invasion of privacy, (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory damages, and (vi) the continued and ongoing risk to their Private Information.'" Dkt. No. 21 at 21 (quoting Dkt. No. 1 ¶ 33). But she fails to provide any factual support for these vague assertions set forth in a section entitled "Purpose of this Lawsuit." *See generally* Dkt. No. 1 ¶¶ 20–34, 35–42. For example, Plaintiff does not specifically contend that she spent any time undertaking data security measures, resetting account passwords, or monitoring bank statements for unauthorized account use in support of her assertion that she "lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel" (Dkt. No. 21 at 21; Dkt. No. 1 ¶ 33). Nor does Plaintiff make contentions regarding the specific private information she contends that she shared with Defendant and that Defendant, in turn, shared to third parties. Without this factual support —all of which is within Plaintiff's personal knowledge—Plaintiff has not plead a concrete detriment for purposes of an unjust enrichment claim.

Finally, the Court addresses Plaintiff's argument that she has adequately shown that it would be unjust for Defendant to retain the benefit conferred. First, Plaintiff has not made allegations that Defendant has received financial compensation from Plaintiff as a result of providing medical services.[6] None of the citations to the Complaint that Plaintiff points to include the allegation that Plaintiff ever paid Defendant for the provision of medical services.

---

[6] Plaintiff claims that "similar" claims were upheld in *Doe v. Meta Platforms*. Dkt. No. 21 at 21–22. That case is inapt as it discusses an unjust enrichment claim in the context of Defendant Meta Platforms, Inc. selling plaintiffs' data and unjustly retaining the proceeds which is not the situation alleged in this case. *See Meta Platforms*, 2023 WL 5837443, at *13.

*See* Dkt. No. 1 ¶¶ 38, 191, 193; Dkt. No. 21 at 26. Plaintiff must plead all relevant facts in the complaint itself, rather than relying on facts pleaded in briefs, to meet the pleading requirements. *See Finley v. TransUnion*, No. C17-7165, 2019 WL 3238903, at *3 (N.D. Cal. July 18, 2019). Plaintiff also argues that Defendant has "benefitted from the disclosure of Plaintiffs' Private Information for marketing and retargeting." Dkt. No. 21 at 21. Plaintiff makes minimal allegations as to Defendant's use of the Pixel and subsequent retargeting campaigns. However, taking the pleadings in the light most favorable to Plaintiff—and bearing in mind that the specifics of Defendant's marketing costs are not visible to Plaintiff at this stage in litigation—Plaintiff's allegation that "[b]y utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant" would be sufficient to plead a retention of monetary benefits by Defendant for purposes of Plaintiff's unjust enrichment claim and for the narrow purpose of surviving a motion to dismiss. *See* Dkt. No. 1 ¶ 135; *Boone Health*, 2023 WL 4996773, at *4 (finding that defendants' monetizing of advertising benefits sufficient to state a claim for unjust enrichment on a motion to dismiss).

For the foregoing reasons, Plaintiff's unjust enrichment claim is DISMISSED with leave to amend.

## G.     Counts VI–VIII: Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*

Plaintiff brings three claims under the ECPA on behalf of herself and the putative national class: unauthorized interception, use, and disclosure pursuant to 18 U.S.C. § 2511(1) (Count VI); unauthorized divulgence by electronic communications service pursuant to 18 U.S.C. § 2511(3)(a) (Count VII); and unauthorized disclosure of communications while in electronic storage by an electronic communications service pursuant to 18 U.S.C. § 2702(a)(1) (Count VIII). Dkt. No. 1 ¶¶ 201–58. Defendant contends that each of these claims fails because

Plaintiff has failed to allege any unlawful interception, there is no civil liability for procuring an

interception by a third party, Plaintiff has failed to show that the contents of any communications

were disclosed to a third party, and Defendant is not a provider of an electronic communications

service under either Section 2511(3)(a) or 2702(a)(1) of the ECPA. Dkt. No. 17 at 20–27.

All three of Plaintiff's claims under the ECPA (18 U.S.C. § 2510, *et seq*.) "require[] a

showing that the defendant '(1) intentionally (2) intercepted, endeavored to intercept or procured

another person to intercept or endeavor to intercept (3) the contents of (4) an electronic

communication, (5) using a device.'" *See In re Facebook Internet Tracking Litig.*, 263 F. Supp.

3d 836, 844 (N.D. Cal. 2017) (quoting *In re Google Cookie Placement Consumer Privacy Litig.*,

806 F.3d 125, 135 (3d Cir. 2015)).

Defendant first argues that "Plaintiff cannot establish that any communication has been

unlawfully 'intercepted' by Overlake," because the ECPA is a one-party consent statute. Dkt.

No. 17 at 21 (citing 18 U.S.C. § 2511(2)(d)). Under the ECPA, it is not unlawful for a person to

intercept electronic communications "where such person is a party to the communication," as

Defendant is here. 18 U.S.C. § 2511(2)(d); *see also In re Facebook, Inc. Internet Tracking*

*Litigation*, 956 F.3d 589, 607 (9th Cir. 2020) ("Both [the ECPA and CIPA] contain an exemption

from liability for a person who is a 'party' to the communication, whether acting under the color

of law or not."); *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d Cir.

2016) ("Here, Google was either a party to all communications with the plaintiffs' computers or

was permitted to communicate with the plaintiffs' computers by Viacom, who was itself a party

to all such communications."); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 519 (C.D. Cal. 2021)

("Whereas in *In re Facebook* the plaintiffs alleged *Facebook* recorded communications between

the plaintiffs and third parties to which Facebook was *not* a party, here, Plaintiff alleges Nike and

FullStory recorded Plaintiff's communications with Nike."). It is clear from Plaintiff's complaint

that Defendant was a party to Plaintiff's website communications, and Plaintiff does not dispute this contention. *See* Dkt. No. 1; Dkt. No. 21 at 22–23. To the extent that Plaintiff alleges that Defendant surreptitiously recorded its own communications with Plaintiff, the Court finds that the one-party consent exemption applies.

Because Defendant was a party to the at-issue communications, the issue becomes "whether the alleged conduct was conducted with criminal and/or tortious intent under the statute, such that it would qualify for the exception that renders the party exception inapplicable." *Eisenhower Med. Ctr.*, 2024 WL 878100, at *5. Courts within this Circuit have held "that a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself." *Id.* (emphasis in original) (citing *Pena v. GameStop*, 670 F. Supp. 3d 1112, 1119 (S.D. Cal. 2023)).

Plaintiff argues that Overlake's "act of *recording* Plaintiff's and Class Members' communications" is distinct from the *transmission* of those communications to third parties, and that such transmission is an independent tortious or criminal act. Dkt. No. 21 at 23. But "Plaintiff points to no legal authority providing that the exception to § 2551(2)(d) is triggered when, as here, the tortious conduct is the alleged wiretapping itself." *Pena*, 670 F. Supp. 3d at 1119 (quoting *In re Google Cookie*, 806 F.3d at 145). *Pena* is instructive here: in *Pena*, plaintiffs alleged that GameStop covertly created secret transcripts of all communications through the chat feature on its website, which it then shared with Zendesk, a third party that harvests highly personal data from chat transcripts for sales and marketing purposes. *Id.* at 1115. The alleged conduct in *Pena* was significantly more bifurcated than the conduct alleged here, where Plaintiff alleges the simultaneous transmission of communications to third parties like Facebook (*see* Dkt. No. 1 ¶ 61), yet the court declined to distinguish between the act of *recording* and the act of

1    *transmitting*. *Pena*, 670 F. Supp. 3d at 1120. Further, the "criminal or tortious acts contemplated

2    by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or

3    criminal use of the interception's fruits." *Id.* (quoting *In re Google Cookie*, 806 F. Supp. 3d at

4    145). Plaintiff fails to plead a tortious or criminal use of the acquired communications, separate

5    from the recording, interception, or transmission. *See generally* Dkt. No. 1. For this reason, the

6    tortious or criminal act exception does not apply here.[7]

7          For the foregoing reasons, Plaintiff's ECPA claims are DISMISSED with leave to amend.

8    **H.    Count IX: Violation of the Computer Fraud and Abuse Act (18 USC 1030, *et seq.*)**

9          Plaintiff brings a claim under the Computer Fraud and Abuse Act ("CFAA") on behalf of

10   herself and the putative national class. Dkt. No. 1 ¶¶ 259–66. Defendant argues that Plaintiff fails

11   to plead that Defendant exceeded its authorized access or any direct costs as defined under the

12   CFAA. Dkt. No. 17 at 27–28.

13         A defendant is liable under the CFAA when they "intentionally accesses a computer

14   without authorization or exceed[] authorized access, and thereby obtain[ ] (A) information

15   contained in a financial record of a financial institution, . . . (B) information from any department

16   or agency of the United States, or (C) information from any protected computer." 18 U.S.C.

17   § 1030(a)(2). "'Exceeds authorized access' means to access a computer with authorization and to

18   use such access to obtain or alter information in the computer that the accesser is not entitled so

19   to obtain or alter." 18 U.S.C. § 1030(e)(6).

20         Plaintiff argues that "[w]here a defendant accesses information from a protected

21   computer under false pretenses – such as here, where a hidden tracking device was employed by

22   Defendant to copy and transmit information from a protected computer – . . . the access is

23

24   ───────────
     [7] Because the Court has determined that Plaintiff has not alleged the first prong of an ECPA claim, it declines to
     address the Parties' additional arguments with respect to Plaintiff's ECPA claims.

1  unauthorized." Dkt. No. 21 at 28 (citing *America Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444

2  (E.D. Va. 1998)). Plaintiff relies on *America Online* for the proposition that because Defendant's

3  access to Plaintiff's communications was obtained under false pretenses, "Defendant's entire

4  access to the information contained in Plaintiff's communications and devices was illegitimate."

5  Dkt. No. 21 at 28. *America Online* dealt with defendants who "harvested, or collected, the e-mail

6  addresses of AOL members in violation of AOL's Terms of Service," and who maintained AOL

7  accounts in order to harvest the email addresses of AOL members. 46 F. Supp. 2d at 448.

8  According to the court, the AOL defendants *viewed* the email addresses of other members with

9  authorization, but used such access to *harvest* those email addresses, which they were not

10  entitled to do. *Id.* at 450.

11        However, *America Online* preceded *Van Buren v. United States*, 593 U.S. 374 (2021),

12  which explicitly holds that access in violation of webpage terms of service does not "exceed

13  authorized access" for purposes of the CFAA. In *Van Buren*, a former police sergeant ran a

14  license-plate search in a law enforcement computer database in exchange for money. 593 U.S. at

15  378. The defendant in *Van Buren* "accessed the law enforcement database system with

16  authorization," "even though he obtained information from the database for an improper

17  purpose." *Id.* at 396. The Court held that Van Buren did not "exceed authorized access," and

18  specifically opined about the application of the "exceeds authorized access" clause to violations

19  of computer use policies, saying:

20              As discussed, the Government reads the "exceeds authorized
              access" clause to incorporate purpose-based limits contained in
21              contracts and workplace policies. . . . Many websites, services, and
              databases—which provide "information" from "protected
22              computer[s]," § 1030(a)(2)(C)—authorize a user's access only
              upon his agreement to follow specified terms of service. If the
23              "exceeds authorized access" clause encompasses violations of
              circumstance-based access restrictions on employers' computers, it
24              is difficult to see why it would not also encompass violations of

1
2
3

> such restrictions on website providers' computers. . . . In sum, an individual "exceeds authorized access" when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him.

*Id.* at 394–97. Although Plaintiff frames her argument as a question of whether Defendant's authorization was legitimately obtained, she does not cite to any caselaw post-dating *Van Buren* that supports such an interpretation of use restrictions invoked by a website's terms of use. For this reason, the Court must find that Defendant did not exceed authorized access or otherwise intentionally access a computer without authorization for purposes of a CFAA claim.

For the foregoing reasons, Plaintiff's CFAA claim is DISMISSED with leave to amend.

## I.    Count X: Washington Consumer Protection Act ("CPA") (RCW 19.86.020)

Plaintiff brings a claim under the CPA on behalf of herself and the putative national class. Dkt. No. 1 ¶¶ 267–76. Defendant argues that Plaintiff has failed to establish injury to her business or property. Dkt. No. 17 at 29.

The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. "To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)). Either an unfair or a deceptive act can be the basis for a CPA claim. *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013).

The Parties dispute whether Plaintiff has sufficiently alleged an injury under the CPA. And while the Court finds that Plaintiff has not adequately alleged an injury, the Court disagrees that Plaintiff must allege it is a participant in the market for private information in order to show

injury. In *Guy v. Convergent Outsourcing, Inc.*, the court found that Plaintiffs had alleged injury without allegations of participation in the market for private information. No. C22-1558, 2023 WL 4637318, at *8 (W.D. Wash. July 20, 2023) ("Plaintiffs assert that the diminished value of their PII and the lost time spent remedying the PII disclosure are compensable. The allegations of the lost value of the PII are sufficient to show an injury, because 'the injury requirement is met upon proof the plaintiff's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.'" (quoting *Panag*, 204 P.3d at 899)). But in *Guy*, plaintiffs provided significantly more substantial allegations regarding injury than Plaintiff has here:

> To satisfy concerns about standing and injury, Plaintiffs provide allegations about the value of their PII and the other injuries they have suffered. First, Plaintiffs allege that as a result of the Convergent data breach their PII has lost economic value because it is now readily available, and they received nothing in return for its disclosure. Plaintiffs allege on information and belief that their PII is now available for sale on the "Dark Web," and that it may have a value ranging from $40 to $363, depending on the sensitivity of the information. Plaintiffs also allege that there is an "active and robust legitimate market," which is referred to as the "data brokering industry," through which individuals can sell their person data for up to $50 a year. Plaintiff Guy believes his PII has already been sold to criminals, given that he now receives many spam phone calls and emails daily after the data breach, but not before. Second, Plaintiffs allege that they have spent time trying to monitor fraudulent activity arising from the data breach. This includes Plaintiff Tanner who found $100 fraudulent charge on Netflix that he spent several hours disputing (though he does not allege any out-of-pocket costs).

2023 WL 4637318, at *1 (internal citations omitted). Plaintiff here makes no such allegations regarding her injury; without more specific allegations, her CPA claim cannot survive.

For the foregoing reasons, Plaintiff's CPA claim is DISMISSED with leave to amend.

1

### IV.   CONCLUSION

2      Accordingly, the Complaint is DISMISSED in its entirety with leave to amend except for

3  Plaintiff's Breach of Confidence claim which is dismissed with prejudice.

4

5      Dated this 13th day of May 2024.

6

7                                               Tana Lin
                                                United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24