# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

## SEATTLE DIVISION

| | |
|---|---|
| **JACQ NIENABER,** | **Case No. 2:23-cv-01159-TL** |
| *on behalf of herself and all others similarly situated*, | **Judge Tana Lin** |
| **Plaintiff,** | |
| v. | |
| **OVERLAKE HOSPITAL MEDICAL CENTER,** | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| **Defendant.** | **JURY TRIAL DEMANDED** |

Plaintiff Jacq Nienaber brings this action in her individual capacity and on behalf of all others similarly situated against Defendant Overlake Hospital Medical Center ("Overlake" or "Defendant"), and alleges, upon personal knowledge as to her own actions, her counsel's investigation, and upon information and belief as to all other matters, as follows:

---

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

1.    Plaintiff brings this case to address Defendant's illegal and widespread practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook") and Google, Inc. ("Google"), without the consent of the Plaintiff or Class Members. The Private Information that was shared and disclosed included medical conditions, symptoms, and treatments, and other information that was provided to Defendant pursuant to a confidential hospital patient relationship.

2.    Defendant owns and controls the website https://www.overlakehospital.org (the "Website"). Through the Website, patients can conduct searches about various medical conditions and treatments and the practitioners at each location who provide medical services. The Website also enables patients to pay bills, search for providers with whom to book appointments, and log in to Overlake's MyChart Patient Portal.

3.    Unbeknownst to its patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website. These Tracking Tools, including Meta Platforms, Inc.'s Tracking Pixel (the "Facebook Pixel" or "Pixel") and Google, Inc.'s Google Tag Manager and/or Google Analytics tools, track and collect communications with the Defendant via the Website and surreptitiously force the user's web browser to send those communications to undisclosed third parties, such as Facebook or Google.

4.    The information collected and disclosed by Defendant's Tracking Tools is not anonymous. Facebook connects user data from Defendant's Website to the individual's Facebook ID (FID). The FID links the user to his/her Facebook profile, which contains detailed information about the profile owner's identity.

5.    Thus, operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent FID.

6.    Similarly, Google "stores users' logged-in identifier on non-Google websites . . . in its logs . . . Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's

browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads. ."[1]

7.      Simply put, the health information disclosed through the tracking technologies is personally identifiable.

8.      Based on Defendant's use of the Pixel, and evidence demonstrating that the information transmitted via the Pixel was indeed linked to Plaintiff's personal Facebook account, Plaintiff asserts Defendant also installed and implemented the Facebook Conversions Application Programming Interface ("Conversions API") on its Website.

9.      By implementing Conversions API, Defendant secretly enabled additional unauthorized transmissions and disclosures of Plaintiff's and Class Members' Private Information.[2]

10.     More specifically, Defendant's Website directs Plaintiff's and Class Members' communications to automatically and surreptitiously be sent to Facebook's servers. This occurs on every webpage on which Defendant has installed the Tracking Pixel and Conversions API.[3]

11.     Similarly, Conversions API stores Plaintiff's and Class Members' Private Information from visiting Defendant's Website and transmits it to Facebook.

***Tracking Pixels***

12.     A pixel is a piece of code that "tracks the people and the types of actions they take"[4] as

---

[1] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses. IP addresses have been classified by the U.S. Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 2, 2024) ("Such PHI may include, for example, an individual's IP address . . .").

[2] "Conversions API works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See How to implement Conversions API*, Fetch&Funnel, https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify (last visited Aug. 2, 2024).

[3] "Server events are linked to a dataset ID and are processed like events sent using the Meta Pixel . . . . This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *Conversion API*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Aug. 2, 2024).

[4] *How Does Retargeting on Facebook Help Your Business?*, Meta Retargeting, https://www.facebook.com/business/goals/retargeting (last visited Aug. 2, 2024).

they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

13.     The User's web browser executes the Pixel via instructions within the Defendant's webpage to communicate directly to Facebook certain data fields configured by the Defendant.

14.     The pixel can share the user's Facebook User ID for easy tracking via the "cookie" that Facebook stores every time someone accesses their Facebook account from the same web browser.[5]

15.     The Facebook Pixel is programmable, meaning that the Defendant controls which of its webpages contain the Pixel and which user activity, events, and data fields are tracked and transmitted to Facebook.

16.     Over the past twenty years, Pixel Technologies have gained prominence and are routinely used in digital marketing and online commerce to target specific customers. To work effectively, consumer data is used to build individual online profiles that serve as the initial foundation for retargeting and highly focused marketing campaigns. The entire purpose of the Pixel is to increase consumer conversions through marketing efficiency that is derived from placing targeted content and adds in front of individuals most likely to react to the add or content. Retargeting through the use of "cookies" and pixels has come under intense public scrutiny due to privacy concerns.

17.     Upon information and belief, in the context of this lawsuit, the purpose of using the Pixel was to target new patients who would seek medical services at Overlake and increase the hospital's revenue. This was done at the expense of Plaintiff's and Class members' privacy.

*Conversions API*

18.     The Facebook Conversions API allows businesses and companies to send web events from their servers to Facebook.[6]

---

[5] "Cookies are small files of information that a web server generates and sends to a web browser. . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." *What are Cookies*, Cloudflare, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Aug. 2, 2024).

[6] R. Paquette, *What is Facebook Conversions API and How to Use It*, Revealbot (Mar. 5, 2021) https://revealbot.com/blog/facebook-conversions-api/ (last visited Aug. 2, 2024).

19.    Conversions API is designed to create a direct and reliable connection between marketing data (such as website events and offline conversions) from Defendant's server to Facebook.[7] In doing so, Defendant stores Plaintiff's and Class Members' Private Information on Defendant's own server and then transmits it to Facebook.

20.    Conversions API is an alternative method of tracking versus the Pixel because no privacy protections on the user's end can defeat it. This is because it is implemented Server-Side, rather than executed by Users' web browsers.

21.    Because Conversions API is Server-Side, it cannot access the Facebook Cookie to retrieve the Facebook User ID.[8] Therefore, other round-about methods of linking the user to their Facebook account must be employed.[9]

22.    Facebook has an entire page within their developers' website about how to de-duplicate data received when a Pixel is executed as well as Conversions API.[10]

23.    Conversions API tracks the user's website interaction, including Private Information, and then transmits this data to Facebook. Indeed, Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."

***Purpose of this Lawsuit***

24.    Accordingly, this case arises from Defendant's intentional, reckless, and/or negligent

---

[7] Meta, *About Conversions API*, Meta Business Help Center. https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Aug. 2, 2024).

[8] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses, and phone numbers, that we use for matching purposes only." Meta, *Customer Information Parameters*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited Aug. 2, 2024).

[9] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." Meta, *Send Required and Recommended Parameters*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req-rec-params (last visited Aug. 2, 2024).

[10] Meta, *Handling Duplicate Pixel and Conversions API Events*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events (last visited Aug. 2, 2024).

1  disclosure of Plaintiff's and Class Members' confidential and private medical information to Facebook

2  and Google.

3        25.    The information that Defendant's Tracking Pixel and Conversions API sent to Facebook

4  included Private Information that Plaintiff and Class Members submitted to Defendant's Website,

5  including for example, the type of medical treatment sought, the particular health condition, the fact that

6  the individual attempted to book a medical appointment, and the fact that the individual was paying

7  medical bills. Such Private Information would allow a third party (e.g., Facebook) to know that a specific

8  patient was seeking confidential medical care. This type of disclosure could also allow a third party to

9  reasonably infer that a specific patient was being treated for a specific type of medical condition such as

10  cancer, pregnancy, dementia, or HIV.

11       26.    Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party

12  marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications

13  obtained via the Facebook Pixel and Conversions API.

14       27.    For instance, Plaintiff submitted medical information to Defendant's Website and used the

15  Website to schedule appointments with healthcare professionals, research her specific medical

16  conditions, and pay her medical bills.

17       28.    This information was intercepted and disclosed to Facebook, which later sent Plaintiff

18  targeted advertisements based on her communications with Defendant.

19       29.    Defendant regularly encourages Plaintiff and Class Members to use its digital tools,

20  including its Website, to receive healthcare services. Plaintiff and Class Members provided their Private

21  Information through Defendant's Website with the reasonable understanding that Defendant would secure

22  and maintain that Private Information as confidential.

23       30.    At all times Plaintiff and Class Members visited and utilized Defendant's Website, they

24  had a reasonable expectation of privacy in the Private Information collected through Defendant's

25  Website, including that it would remain secure and protected and only utilized for medical purposes.

26       31.    Plaintiff and Class Members provided Private Information to Defendant in order to receive

27  medical services rendered and with the reasonable expectation that Defendant would protect their Private

28

---

Information. Plaintiff and Class Members relied on Defendant to secure and protect the Private Information and not disclose it to unauthorized third-parties without their knowledge or consent.

32.    Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchange with Defendant.

33.    Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized disclosure.

34.    Defendant, however, failed in its obligations and promises by utilizing the Tracking Tools, described below, on its Website, knowing that such technology would transmit and share Plaintiff's and Class Members' Private Information with Facebook.

35.    While Defendant willfully and intentionally incorporated the Tracking Tools into its Website, Defendant never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications via the Website with Facebook or Google. As a result, Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook or Google as they communicated their healthcare information and other Private Information via the Website.

36.    Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                4

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

37.     Upon information and belief, Defendant utilized the Tracking Tools and its patients' confidential and sensitive data to create streamlined and targeted marketing aimed at not only converting new patients but attracting the most lucrative patients by targeting web users most likely to have certain types of insurance or that needed medical care involving specialties with the highest return. The Tracking Tools offered no medical advantage to Overlake patients but were solely implemented in an effort to bolster its revenue and profits.

38.     Upon information and belief, in order to participate and gain the advantages of third party digital platforms like Facebook and Google, who offer far more valuable consumer profiles and efficiencies than Overlake could ever generate internally, Overlake placed the Tracking Tools on its web properties with the intent to share and monetize its patients' Private Information without the knowledge or consent of the patients whose information was being shared and monetized. Indeed, Defendants benefitted from this unlawful practice with more efficient marketing that resulted in savings, as well as the acquisition of new patients that added value to the Hospital's revenue and growth. At all times that Defendant was running its Tracking Tools digital marketing programs, Defendant was using valuable patient data without ever paying the rightful owners, the web users and patients, the fair market value for the use of that data. This litigation seeks to remedy in part this unjust enrichment.

39.     Furthermore, Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; , (ii) loss of benefit of the bargain, (iii) diminution and/or loss of value of the Private Information, and (iv) statutory damages,

40.     Plaintiff seeks to remedy these harms and brings causes of action for (i) Negligence; (ii) Invasion of Privacy; (iii) Breach of Implied Contract; (iv) Unjust Enrichment; (v) Breach of Fiduciary Duty; (vi) Violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1)—unauthorized interception, use, and disclosure; (vii) Violations of Wash. Rev. Code Ann. § 7.70 *et seq*. – Injury Resulting from Health Care, and (viii) Violations of the Washington Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86.020, *et seq*.

41.     Plaintiff seeks monetary and equitable relief in the form of compensatory, general, and nominal damages, statutory damages, restitution, and disgorgement of profits, and injunctive relief in the

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                    5

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

form of deletion of certain data that was improperly acquired and serves no medical purpose to be retained.

## PARTIES

### Plaintiff Jacq Nienaber

42.    Plaintiff Nienaber is a natural person and citizen of King County, Washington, where she intends to remain.

43.    She is a current patient of Overlake and has paid for and received medical treatment from Defendant on a recurring basis since approximately 2006, primarily at the Overlake Medical Center location in Bellevue, Washington.

44.    Throughout her patient relationship with Defendant, Plaintiff accessed and utilized Defendant's website via her smartphone and personal laptop as part of her continuum of medical provided by Defendant.

45.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

46.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                    6

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

1    ██████████████████████.

2        47.    ████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████████████████.

6        48.    As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, unauthorized third-parties obtained Plaintiff's communications and PHI. The specific information Facebook and Google received revealed her specific medical symptoms and conditions and the fact that she was seeking and received medical treatment from Defendant.

49.    Plaintiff has had a Facebook account since approximately 2001 and has regularly used the platform since creating her account. Plaintiff also has an Instagram account that she has used regularly for at least the past five years. Plaintiff accesses each of these accounts multiple times every week. Plaintiff also has a Google account.

50.    Plaintiff primarily accesses her Facebook, Instagram, and Google accounts via her smartphone and personal laptop, both of which she used to access Defendant's Website.

51.    Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook, and this data included her PII, PHI, and related confidential information. Specifically, Plaintiff has communicated her name, date of birth, address, phone number, email address, insurance information, medical history, medical symptoms, and payment information through Defendant's digital platform. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

52.    As Defendant's patient, Plaintiff Nienaber reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would

1    not have disclosed her Private Information to Defendant.

2    53. ████████████████████████████████████████

3    █████████████████████████████████████████████████

4    █████████████████████████████████████████████████

5    █████████████████████████████████████████████████

6    ██████████████████████████████████.

7    54.    During her time as a patient, Plaintiff Nienaber never consented to the use of her Private

8    Information by third parties or to Defendant enabling third parties, including Facebook and Google, to

9    receive, access or interpret such information for marketing or any other purpose.

10    55.    Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted

11    Plaintiff Nienaber's Private Information to third parties, such as Facebook and Google.

12    56.    Plaintiff Nienaber has been a regular Facebook user for more than five years.

13    57. ████████████████████████████████████████

14    █████████████████████████████████████████████████

15    ███████████████████████████.

16    58.    These advertisements consistently appeared following Plaintiff's use of Defendant's

17    website in connection with her treatment and diagnosis of her private medical condition.

18    59.    The timing and specificity of these advertisements, coupled with the fact that they are

19    directly related to the medical conditions and symptoms she communicated via the Website and received

20    treatment for, leads her to believe the Facebook, Instagram, and other unauthorized third-parties received

21    her Private Information via Defendant's Website.

22    60. ████████████████████████████████████████

23    █████████████████████████████████████████████████

24    █████████████████████████████████████████████████

25    ██████████████████████████████████.

26    ***Defendant Overlake Medical Center***

27    61.    Defendant Overlake is a nonprofit healthcare organization, headquartered at 1035 116th

28

---

1    Ave NE, Bellevue, Washington 98004.

2        62.    Defendant is one of the largest nonprofit hospital systems in the country, operating a 349-

3    bed hospital and over 1,300 affiliated providers on its medical staff, including more than 300 physicians

4    and advanced-practice providers who are employed by the organization.

5        63.    Defendant is a covered entity under the Health Insurance Portability and Accountability

6    Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164

7    "HIPAA").

8                                **JURISDICTION & VENUE**

9        64.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)

10   because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000,

11   exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one

12   member of the class, is a citizen of a state different from Defendant.

13       65.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this

14   Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*, and 28 U.S.C. §

15   2702) and the CFAA (18 U.S.C. § 1030, *et seq*).

16       66.    This Court has personal jurisdiction over Defendant because its principal place of business

17   is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated

18   from this District.

19       67.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of

20   business is in this District.

21                            **COMMON FACTUAL ALLEGATIONS**
                     ***Background: Underlying Technology Employed by Defendant for the Purpose of***
22               ***Disclosing Plaintiff and Class Members' Private Information to Facebook.***

23       68.    Defendant intentionally placed the Pixel and Conversions API tools on numerous

24   webpages of its Website, for the purpose of transmitting patients' confidential and safeguarded

25   communications to Facebook. This transmission includes communications containing Plaintiff's and

26   Class Member's Private Information.

27       69.    Defendant uses its Website to connect Plaintiff and Class Members to Defendant's digital

28

---

PLAINTIFF'S SECOND AMENDED                          9              MARKOVITS, STOCK & DEMARCO, LLC
COMPLAINT (2:23-CV-01159-TL)                                       119 East Court Street, Suite 530
                                                                  Cincinnati, Ohio 45202
                                                                  Telephone: (513) 651-3700

healthcare platforms with the goal of increasing profitability.

70.    In order to fully understand Defendant's unlawful data-sharing practices, it is important to understand basic web design and tracking tools.

***Facebook's Business Tools and the Pixel***

71.    Facebook currently operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[11]

72.    As part of its advertising operations, Facebook actively encourages and supports entities and website owners, like Defendant, to employ Facebook's "Business Tools" in order to collect, categorize, target, and promote products and services to individuals who visit the owner's website.

73.    Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

74.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, as well as, for example, webpage's Universal Resource Locator ("URL"), metadata, and button clicks.[12] Advertisers, such as Defendant, can track other user actions and can customize their own tracking parameters by building a "custom event."[13]

75.    One such Business Tool is the Pixel which "tracks the people and type of actions they take" on a given webpage.[14] Upon a user visiting a webpage that hosts the Pixel, their interactions with

---

[11] Meta, *Meta reports Fourth Quarter and Full Year 2021 Results*, Meta Investor Relations (Feb. 2, 2022), https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Aug. 2, 2024).

[12] Meta, *Specification for Meta Pixel Standard Events*, Meta Business Help Center, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Aug. 2, 2024); *see also* Meta, *Best Practices for Meta Pixel Setup*, Meta Business Help Center, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Aug. 2, 2024); Meta, *App Events API*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Aug. 2, 2024).

[13] Meta, *About Standard and Custom Website Events*, Meta Business Help Center, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Aug. 2, 2024); *see also App Events API*, Meta for Developers, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Aug. 2, 2024).

[14] *Supra*, fn. 4.

the host webpage are surreptitiously replicated, then transmitted to Facebook's servers. This journey occurs seamlessly, starting from the user's browser and ending at Facebook's server.

76.   Notably, this transmission exclusively takes place on webpages that host the Facebook Pixel. Consequently, Plaintiff's and Class Members' Private Information would not have been shared with Facebook through the Pixel had Defendant chosen not to install the software on its Website.

77.   Similarly, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool as well.

78.   Through its installation and utilization of both tools, Defendant intercepted and transmitted Plaintiff's and Class Members' communications with Facebook via the Pixel. Additionally, Defendant caused a second improper disclosure of Private Information through its use of Conversions API.

79.   As detailed below, Defendant's source code initiates these illegal transmissions simultaneously with communications made through specific webpages.

***Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Pixel and/or Conversions API i.e., the Interplay Between HTTP Requests and Responses, Source Code, and the Pixel***

80.   Web browsers are software applications that enable consumers to browse the web, and view and exchange electronic information and communications over the Internet. Each "client device," (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, or Microsoft's Edge browser).

81.   Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

82.   Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF for filing a motion to a court).

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data from visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of web pages, other kind of files, text information, or error codes, among other data.[15]

83.    A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "Book an Appointment" page). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

84.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

85.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's Pixel is source code that does just that.

86.    The Pixel acts like a wiretap. When patients visit Defendant's website via an HTTP Request to Overlake's server, Defendant's server sends an HTTP Response including the Markup that

---

[15] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

displays the Webpage visible to the user and Source Code including Defendant's Pixel. In essence, Defendant is handing its patients a "tapped phone." Once the webpage is loaded onto the patients' browser, a covert software-based wiretap is silently activated, waiting for private communications on the webpage to initiate the interception. These intercepted communications, intended solely for Defendant, are then transmitted to third parties, including Facebook and Google.

87.     Third parties, such as Facebook and Google, implant third-party cookies into the web browser of users who are logged into their services on the same device. These cookies serve the purpose of uniquely identifying the user and are included with each intercepted communication. By doing so, the third-party can accurately identify the patient associated with interception Personal Information.

88.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Information, like Facebook, implement workarounds that even savvy users cannot evade.  Facebook's workaround is called Conversions API. Conversions API is an effective workaround because it does the transmission from their own servers and does not rely on the user's web browsers. Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Hence, the interactions between patients and Defendant, which are essential for using Defendant's Website, are effectively received and stored on Defendant's server. Subsequently, the Conversions API directly retrieves and transmits the Private Information present in those interactions from Defendant to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

89.     While there is no way to confirm with certainty that a Web host like Defendant has implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[16] Thus, it is reasonable to infer that Facebook's customers who implement the Facebook Pixel in accordance with Facebook's documentation will also

---

[16] *See* Meta, *Best Practices For Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited Aug. 2, 2024).

1    implement the Conversions API workaround.

2        90.    The third parties to whom a website transmits data via pixels and similar methods do not

3    contribute significant content pertaining to the user's communications. Rather, these third parties are

4    commonly engaged to monitor user data and communications for the website owner's marketing

5    objectives, primarily aimed at enhancing profitability.

6        91.    Thus, without any knowledge, authorization, or action by a user, a website owner like

7    Defendant can use its source code to commandeer the user's computing device, causing the device to

8    contemporaneously and invisibly transmit the users' communications to third parties.

9        92.    In this case, Defendant employed the Tracking Pixel and Conversions API tools to

10   intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook.

11       93.    For example, when a patient visits www.overlakehospital.org and selects the "Book an

12   Appointment" button, the patient's browser automatically sends an HTTP Request to Defendant's web

13   server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for

14   that particular webpage. As depicted below, the user only sees the Markup, not Defendant's Source Code

15   or underlying HTTP Requests and Responses. Additionally, it is to be noted that upon clicking the "Book

16   an Appointment" button, patients are re-directed to a separate page with a different HTTP address:

17   overlakehospital.org/visit/virtual-care.

18
19
20
21   
22
23
24
25
26
27   *Figure 1. The image above is a screenshot taken from the user's web browser upon visiting*
     overlakehospital.org *(as accessed 18 July, 2023).*
28

PLAINTIFF'S SECOND AMENDED                                MARKOVITS, STOCK & DEMARCO, LLC
COMPLAINT (2:23-CV-01159-TL)              14               119 East Court Street, Suite 530
                                                          Cincinnati, Ohio 45202
                                                          Telephone: (513) 651-3700

94.     The Facebook Tracking Pixel is embedded in Defendant's Source Code contained in its HTTP Response. The Pixel, programmed to automatically track and transmit the patient's communications with Defendant's Website to Facebook, executes instructions that effectively open a hidden spying window into the patient's browser through which Facebook can intercept the visitor's data, actions, and communications with Defendant.[17]

95.     Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

96.     Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" it patients' computing devices, allowing Facebook and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

97.     Consequently, when Plaintiff and Class Members visit Defendant's website and communicate their Private Information, including, but not limited to, button clicks and selections, and text typed into search bar including conditions, symptoms, and treatments, third parties like Facebook receive the information.

***Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook Using the Pixel and/or Conversions API Tracking Practices***

98.     Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API ("First Party cookies") on its Website and servers to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.[18]

---

[17] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

[18] *Id.*

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

99.     Defendant's Pixel has its own unique identifier (represented as id=712682029240809), which can be used to identify which of Defendant's webpages contain the Pixel.

100.     The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.[19] However, Defendant's Website does not rely on the Pixel in order to function.

101.     While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

102.     Plaintiff and Class Members were not informed that their Private Information would be shared with Facebook when they communicated it to Defendant, primarily due to Defendant's failure to disclose this fact, among other reasons.

103.     Plaintiff and Class Members never consented, agreed, or otherwise permitted Defendant to disclose their Private Information to Facebook. Furthermore, they did not have any intention for Facebook to be involved in their communications with Defendant, which often contained highly sensitive and confidential information.

104.     Defendant's Pixel and First Party cookies sent non-public Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (1) health conditions; (2) desired medical treatment or therapies; and (3) phrases and search queries (such as searches for symptoms, treatment options, or types of providers).

105.     Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[20]

106.     A user's FID is associated with their personal Facebook profile, which typically includes various demographic and personal information about the user. This information can encompass details

---

[19] *Id.*

[20] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised of a unique and persistent set of numbers.

such as location, photos, personal interests, employment history, relationship status, and other relevant particulars. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

107.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel and First Party cookies) that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

### Defendant's Pixel Disseminates Patient Information via Its Website

108.    An example illustrates the point. If a patient uses the Website to schedule an appointment with an Overlake hospital, Defendant's Website directs them to communicate Private Information, including the type of medicine being sought out, the type of appointment being scheduled, and the desired location. Unbeknownst to the patient, each and every communication is sent to Facebook via Defendant's Pixel, including the buttons clicked and the filters they select.



MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

1    109.    In the example above, the user is being prompted to select the Overlake hospital of choice,

2  usually one that is easily accessible to the patient's current location.

3    110.    Next, the user selects the most convenient or preferred location, or has the option to "select

4  all."

5    111.    Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used

6  to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's

7  Pixel.

8    112.    Thus, without alerting the user, Defendant's Pixel sends the communications the user

9  made via the webpage to Facebook, and the images below confirm that the communications Defendant

10  sends to Facebook contain the user's Private Information.

- **method**: GET
- **url**: https://www.facebook.com/tr/?id=712682029240809&ev=PageView&dl=https://www.overlakehospital.org/visit/schedule-an-appointment&rl=&if=false&ts=1670424999547&sw=1366&sh=768&v=2.9.89&r=stable&ec=0&o=30&fbp=fb.1.1670424925098.8386748
- **httpVersion**: http/1.1

13    113.    The URL contains, "?id=712682029240809" refers to Defendant's Pixel ID and confirms

15  that Defendant has downloaded the Pixel into its Source Code for this particular webpage.

16    114.    On the same line of text, "ev= PageView," identifies and categorizes which actions the

17  user took on the webpage ("ev=" is an abbreviation for event, and "PageView" is the type of event). Thus,

18  this identifies the user as having viewed the "Schedule an Appointment" page on the Overlake Hospital

19  website.

20    115.    Finally, the highlighted text ("GET") demonstrates that Defendant's Pixel sent the user's

21  communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user

22  ID), thereby allowing the user's communications and actions on the website to be linked to their specific

23  Facebook profile.

24

25

26

27

28

- **method**: GET
- **url**: https://www.facebook.com/tr/?id=712682029240809&ev=PageView&dl=https://www.overlakehospital.org/visit/schedule-an-appointment&rl=&if=false&ts=1670424999547&sw=1366&sh=768&v=2.9.89&r=stable&ec=0&o=30&fbp=fb.1.1670424925098.8386748
- **httpVersion**: http/1.1
- **headers**:
   [{'name': ':authority', 'value': 'www.facebook.com'}, {'name': ':method', 'value': 'GET'}, {'name': ':path', 'value': '/tr/?id=712682029240809&ev=PageView&dl=https%3A%2F%2Fwww.overlakehospital.org%2Fvisit%2Fschedule-an-appointment&rl=&if=false&ts=1670424999547&sw=1366&sh=768&v=2.9.89&r=stable&ec=0&o=30&fbp=fb.1.1670424925098.8... {'name': ':scheme', 'value': 'https'}, {'name': 'accept', 'value': 'image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8'}, {'name': 'accept-encoding', 'value': 'gzip, deflate, br'}, {'name': 'accept-language', 'value': 'en-US,en;q=0.9'}, {'name': 'cookie', 'value': 'sb=KD-9Xz10OlpiUei40RtjsiVI; datr=XTCCY_GYNdQNO93Ot5YIP45M; locale=en_US; c_user=███████████ xs=9%3AqLe5YoUdKssw3A%3A2%3A1670387326%3A-1%3A1665%3A%3AAcVdWkbrz-eozzelbKmCgj-j_K9frpo7x_xog_9IhQ; fr=0w$tx9kjiWZBr5Y2i.AWVC9KjWLuDzbMeZYQnwsLBHbbU.BjkIcs.7P.AAA.0.0.BjkIcs.AWVUS8qaMK0; dpr=1'}, {'name': 'sec-ch-ua', 'value': '"Not?A_Brand";v="8", "Chromium";v="108", "Google Chrome";v="108"'}, {'name': 'sec-ch-ua-mobile', 'value': '?0'}, {'name': 'sec-ch-ua-platform', 'value': '"Windows"'}, {'name': 'sec-fetch-dest', 'value': 'image'}, {'name': 'sec-fetch-mode', 'value': 'no-cors'}, {'name': 'sec-fetch-site', 'value': 'cross-site'}, {'name': 'user-agent', 'value': 'Mozilla/5.0 (Windows NT 6.3; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.0.0 Safari/537.36'}]
- **queryString**:
   [{'name': 'id', 'value': '712682029240809'}, {'name': 'ev', 'value': 'PageView'}, {'name': 'dl', 'value': 'https%3A%2F%2Fwww.overlakehospital.org%2Fvisit%2Fschedule-an-appointment'}, {'name': 'rl', 'value': ''}, {'name': 'if', 'value': 'false'}, {'name': 'ts', 'value': '1670424999547'}, {'name': 'sw', 'value': '1366'}, {'name': 'sh', 'value': '768'}, {'name': 'v', 'value': '2.9.89'}, {'name': 'r', 'value': 'stable'}, {'name': 'ec', 'value': '0'}, {'name': 'o', 'value': '30'}, {'name': 'fbp', 'value': 'fb.1.1670424925098.838674818'}, {'name': 'it', 'value': '1670424999411'}, {'name': 'coo', 'value': 'false'}, {'name': 'rqm', 'value': 'GET'}]

116.    The image demonstrates that the user's Facebook ID (highlighted as "c_user=" in the image above) was sent alongside the other data. [21]

117.    At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties. For example, the image below indicates that Defendant is also sending its patients' protected health information to Google via Google Tag Manager, and even tracks and records the exact text and phrases that a user types into the general search bar located on Defendant's homepage. In the example below, the user typed "Cancer" into the search bar.

---

[21] The user's Facebook ID is represented as the c_user ID highlight in the image below, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.



118.    Resultantly, that exact phrase is sent to Google. This is simply unacceptable, and there is no legitimate reason for sending this information to Google.

119.    Accordingly, Google receives patients' communications alongside the patients' IP address, which is also impermissible under HIPAA.



120.    In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook or Google alongside their personally identifiable information. Several different methods allow marketers and third-parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                    20

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

1  browser or device. When this happens, the website user's identity is revealed via third-party cookies that

2  work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which

3  contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online

4  communications and interactions to their individual Facebook profile.

5  121.   Defendant does not disclose that the Pixel, First Party cookies, Google Tag Manager,

6  Google Analytics, or any other tracking tools embedded in the Website's source code tracks, records, and

7  transmits Plaintiff's and Class Members' Private Information to Facebook and Google. Moreover,

8  Defendant never received consent or written authorization to disclose Plaintiff's and Class Members'

9  private communications to Facebook or Google.

10          ***Private Information has Inherent Value***

11  122.   In an increasingly data centric economy, Private Information has never been more

12  valuable to companies and health care institutions like Defendant, where it serves as the foundation for

13  marketing campaigns and growth.

14  123.   Companies, like Facebook, Google, Microsoft, and other tech and data focused

15  businesses, use personal information to train algorithms and artificial intelligences, and to curate

16  marketing profiles and then sell access to those profiles and algorithmic tools to companies seeking to

17  hone in on susceptible consumers. The price for participation in a marketing program with Facebook and

18  Google is less than it would be to create the same marketing exposure independently because part of the

19  exchange of value comes from the data that is acquired from the companies' website which is shared with

20  Facebook and Google, who then store the data and apply it to their online profiles creating more authentic

21  and valuable online avatars. The replacement cost of the same marketing reach and effectiveness without

22  sharing the Private Information with Google or Facebook and utilizing their tools, would be exceptionally

23  higher and yield fewer conversions of new patients.

24  124.   In digital marketplaces, such as those offered by Facebook and Google, companies pay

25  for campaigns that have access to the consumer profiles that can only exist if there is a marketable

26  exchange of data to create those profiles. In essence, the user data has become the raw material of the

27  surveillance economy, and it is shared and exchanged through the use of Pixels as described above. Each

28

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                21

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

piece of data that is shared through the Pixel technology has value to Facebook, Google and the company wishing to tailor its adds to certain demographics.

125.    Consumer data has always carried value and consumers have historically been paid for completing surveys or focus groups that evaluate their acts and preferences and are designed to try to predict consumer behavior. Digital data is now bought and sold through data brokers throughout the world. The price of the data depends on the data set and other market conditions, but data points such as those at issue here, including browsing histories, patient status, and certain medical conditions, all carry inherent value in today's data economy.

126.    Moreover, Hospitals and healthcare entities routinely value medical records and numbers of patients when buying and selling practices. The specific value of patient data can be determined based on traditional valuation approaches of market value, replacement value and income value but varies on the circumstances and generally requires a valuation expert opinion on the range of value of the data sets. With the Defendant holding exclusive control over all the data that was shared and improperly disclosed, as well as the return it received on its marketing investments, Plaintiff cannot provide valuation without discovery.

127.    What is known is that at no point did Plaintiff or any Class Members agree to sell or allow Defendant to share their Private Information with a third party for marketing purposes. Yet, Defendant utilized Plaintiff's Private Information and the Class's Private Information for its sole benefit to build a more cost effective marketing campaign with the goal of acquiring new patients or retargeting Plaintiff and Class Members for additional medical services.

128.    Plaintiff and the Class are therefore entitled to the fair market value of their Private Information that Defendant captured and shared with Facebook and other third party marketers. Plaintiff and the Class are also entitled to the disgorgements of any profits gained from the use of the Private Information including replacement costs and income value.

*Defendant's Conduct Violates Its Own Privacy Policies and Promises*

129.     Defendant's Website contains a page dedicated to the "Notice of Privacy Practices"[22] and until recently contained also contained a link to Defendant's "Online Privacy Notice."[23]

130.     For instance, the Notice of Privacy Practices assures Defendant's patients from the start that:

> Each time you visit a hospital, physician, or other health care provider, a record of your visit is made. Typically, this record contains your symptoms, examination and test results, diagnoses, treatment and a plan for future care or treatment. This information is often referred to as your health or medical record. We understand that medical information about you and health is personal and we are committed to protecting medical information about you.[24]

131.     Defendant's Online Privacy Notice further provided,

> Any information submitted by users of the Sites is for the exclusive use of Overlake Medical Center and Clinics as well as our contractors that are involved in the operation of Overlake Medical Center and Clinics' activities and website operations. Overlake Medical Center and Clinics is the sole owner of the information collected on the Sites. We only have access to information you voluntarily give us via email, signup forms, contact forms, registration forms, or other direct contact from you. We will not sell or license this information to any third parties. We will not share your information with any third party outside of our organization unless the third party provides services on our behalf (such as email newsletters or class registration) or if it is required by law (such as to comply with a subpoena or legal process).[25]

132.     Furthermore, Defendant's Notice of Privacy Practices purports to enumerate "How Will We Use and Disclose Your Medical Information." None of the enumerated uses in Defendant's Privacy Statement cover its conduct of surreptitiously collecting Private Information and disclosing it to third parties for marketing purposes.[26]

133.     Defendant violated its own privacy policy by unlawfully intercepting and disclosing

---

[22] https://www.overlakehospital.org/notice-of-privacy-practices (last visited Aug. 2, 2024).

[23] https://www.overlakehospital.org/online-privacy-notice; *see infra*, fn. 25, for archived version.

[24] *Notice of Privacy Practices*, Overlake Medical Center & Clinics (effective March 1, 2021) https://www.overlakehospital.org/notice-of-privacy-practices.

[25] *Online Privacy Notice*, Overlake Medical Center & Clinics (updated December 21, 2018), https://web.archive.org/web/20230802031327/https://www.overlakehospital.org/online-privacy-notice (archived as of Aug. 2, 2023, last visited Aug. 2, 2024).

[26] *Supra*, fn. 24.

---

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                      23

1   Plaintiff's and Class Members' Private Information to Facebook and third parties without adequately

2   disclosing that it shares Private Information with third parties and without acquiring the specific patients'

3   consent or authorization to share the Private Information.

4   **Defendant Violated HIPAA Standards**

5   134.   Under Federal Law, a healthcare provider may not disclose personally identifiable, non-

6   public medical information about a patient, a potential patient, or household member of a patient for

7   marketing purposes without the patients' express written authorization.[27]

8   135.   Defendant is a healthcare entity and thus its disclosure of health and medical

9   communications is tightly regulated. The United States Department of Health and Human Services (HHS)

10   has established "Standards for Privacy of Individually Identifiable Health Information" (also known as

11   the "Privacy Rule") governing how health care providers must safeguard and protect Private Information.

12   Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health

13   care provider can disclose a person's personally identifiable protected health information to a third party

14   without express written authorization.

15   136.   Guidance from the United States Department of Health and Human Services instructs

16   healthcare providers that patient status alone is protected by HIPAA.

17   137.   In *Guidance regarding Methods for De-identification of Protected Health Information in*

18   *Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, the

19   Department instructs:

20      Identifying information alone, such as personal names, residential addresses, or phone
        numbers, would not necessarily be designated as PHI. For instance, if such information
21      was reported as part of a publicly accessible data source, such as a phone book, then this
        information would not be PHI because it is not related to health data… If such information
22      was listed with health condition, health care provision, or payment data, such as an
        indication that the individual was treated at a certain clinic, then this information would
23      be PHI.[28]

24

25

26   _____
     [27] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

27   [28] HHS Office of Civil Rights (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/
     understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 2, 2024).

28

138.    In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[29]

139.    In addition, the Office for Civil Rights (OCR) at the HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[30]

140.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

141.    In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Facebook Pixel.

### *Defendant Violated Industry Standards*

142.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

143.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

144.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy).

145.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

---

[29] HHS OCR (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 2024).

[30] HHS OCR (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 2, 2024).

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                    25

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

146.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

### *Plaintiff's and Class Members' Expectation of Privacy*

147.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

148.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

### *IP Addresses are Personally Identifiable Information*

149.    On information and belief, through the use of the Facebook Pixel on the Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

150.    An IP address is a number that identifies the address of a device connected to the Internet.

151.    IP addresses are used to identify and route communications on the Internet.

152.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

153.    Facebook tracks every IP address ever associated with a Facebook user.

154.    Google also tracks IP addresses associated with Internet users.

155.   Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

156.   Under HIPAA, an IP address is considered personally identifiable information:

    a.   HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

    b.   HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

157.   Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

***Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures***

158.   The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

159.   In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

160.   Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

161.   By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

**TOLLING**

162.   Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and

unlawfully disclosed to Facebook because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

163.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

164.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent as a result of using Defendant's Website (the "National Class").**

165.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

166.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

167.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Nationwide Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose Private Information may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

168.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

    b.    Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

    c.    Whether Defendant violated its privacy policy by disclosing the Private Information of Plaintiff and Class Members to Facebook and/or additional third parties.

    d.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class

Members that their Private Information would be disclosed to third parties;

    e.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    f.   Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

    g.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

    h.   Whether Defendant violated the consumer protection statutes invoked herein;

    i.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

    j.   Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

    k.   Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

    l.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

169.   <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

170.   <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

171.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate

1  method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all

2  other available methods for the fair and efficient adjudication of the controversy alleged herein; it will

3  permit a large number of Class Members to prosecute their common claims in a single forum

4  simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that

5  hundreds of individual actions would require. Class action treatment will permit the adjudication of

6  relatively modest claims by certain Class Members, who could not individually afford to litigate a

7  complex claim against large corporations, like Defendant. Further, even for those Class Members who

8  could afford to litigate such a claim, it would still be economically impractical and impose a burden on

9  the courts.

10       172.   <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for

11  certification because Defendant has acted or refused to act on grounds generally applicable to the Class,

12  thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct

13  toward the Class Members and making final injunctive relief appropriate with respect to the Class as a

14  whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and

15  Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole,

16  not on facts or law applicable only to Plaintiff.

17       173.   The nature of this action and the nature of laws available to Plaintiff and Class Members

18  make the use of the class action device a particularly efficient and appropriate procedure to afford relief

19  to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an

20  unconscionable advantage since they would be able to exploit and overwhelm the limited resources of

21  each individual Class Member with superior financial and legal resources; the costs of individual suits

22  could unreasonably consume the amounts that would be recovered; proof of a common course of conduct

23  to which Plaintiff was exposed is representative of that experienced by the Class and will establish the

24  right of each Class Member to recover on the cause of action alleged; and individual actions would create

25  a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

26       174.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct,

27  the consistent provisions of the relevant laws, and the ascertainable identities of Class Members

28

demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

175. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

176. Unless a Class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

177. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

178. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

    b. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's privacy policy;

    c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

    e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

    f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

---

g.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

179.   Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the National Class)**

180.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

181.   Plaintiff and Class Members are individuals who received and, either directly or indirectly, paid for medical services rendered by Defendant in the course of its business.

182.   Defendant required patients and users, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of interacting with Defendant's website and seeking to obtain medical care and treatment.

183.   Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

184.   Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

185.   Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

186.   These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

187.   The third-party recipients included, but may not be limited to, Facebook and/or Google.

188.   Defendant's duty of care to exercise reasonable care in protecting the confidentiality of Private Information that it is entrusted with arose from ordinary principles of foreseeability, industry standards, and the special relationship that existed between Defendant and its patients. Defendant was

in a superior position to ensure that its systems were sufficient and that its employees and agents were adequately trained to protect against the foreseeable risk of harm to Class Members from the unauthorized disclosure of their Private Information.

189.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.    Engaging the use of the Facebook Pixel and Conversions API when it knew or should have known that this would track and record the interactions of Plaintiff and Class Members with Defendant's Website;

      b.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

      c.    Failing to adequately program the Pixel and Conversions API to protect the anonymity of Plaintiff and Class Members;

      d.    Failing to prevent foreseeable access to Class Members' PHI and PII;

      e.    Negligently and/or recklessly failing to understand or detect the disclosure of Plaintiff's and Class Members' PHI and PII to third parties; and

190.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PHI and PII would result in injury to Class Members. Furthermore, the tracking, recording, and transmission of patients' personal information was foreseeable, as this is what the Pixel is designed to do, and it is widely understood in Defendant's field that third parties often seek to collect data when providing business services, and Defendant's field contains a large quantity of sensitive, confidential information inaccessible from other industries.

191.    Plaintiff and Class Members have been damaged by Defendant's negligent use of the Facebook Pixel and Conversions API. These injuries include, but are not limited to, the loss of privacy of their highly sensitive medical information (such as disclosure of medical conditions and symptoms) and substantial risk of embarrassment flowing from the disclosure of that information to unauthorized

third parties. Moreover, Plaintiff's and Class Members' private information is now in the hands of unknown third parties who may or may not take steps to secure that information.

192.     As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a.   Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b.   Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.   Defendant eroded the essential confidential nature of the provider-patient relationship;

d.   General damages for invasion of their rights in an amount to be determined by a jury;

e.   Nominal damages for each independent violation;

f.   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g.   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.   Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.   Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

### COUNT II
**Invasion of Privacy**
**(On Behalf of Plaintiff and the National Class)**

193.     Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

194.     The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that was never intended to be shared beyond private communications.

195.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

196.    Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

197.    Defendant owed a duty to Plaintiff and Class Members not to give publicity to their private lives to Facebook and Google and, by extension, other third-party advertisers and businesses who purchased Facebook's and Google's advertising services.

198.    Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Facebook, a third-party social media and marketing giant, is highly offensive to a reasonable person.

199.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

200.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

201.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Website because the purpose of the Pixel is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

202.    Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

203.    As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiff and the Class Members was disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

204.    Plaintiff, on behalf of herself and Class Members, seeks compensatory and general damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, punitive damages, plus prejudgment interest, and costs.

205.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

206.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

207.    Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties. Plaintiff also seeks the destruction of all data improperly acquired and used for non medical purposes and which is no longer need for medical purposes.

## COUNT III
### Breach of Implied Contract
### (On behalf of Plaintiff and the National Class)

208.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

209.    When Plaintiff and Class Members provided their user data to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

210.    Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

211.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

212.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to third parties, *i.e.*, Facebook and Google.

213.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

214.    Plaintiff and Class Members are entitled to compensatory and consequential damages, including loss of benefit of the bargain, or nominal damages as a result of Defendant's breach of implied contract.

### COUNT IV
### Unjust Enrichment
### (On behalf of Plaintiff and the National Class)

215.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein, with the exception that this claim is brought in the alternative to breach of contract.

216.    Plaintiff and Class Members conferred a benefit on Defendant when they paid Defendant for its services.

217.    Defendant also benefits substantially from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

218.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including the free use of the data for marketing, savings on marketing costs, marketing conversions of potential patients, conversions of new patients, and conversions of existing patients for new services

219.    The benefit was conferred on Defendant, who was able to use that Private Information, in conjunction with analytics tracking tools, to optimize its website and advertising campaigns, increasing the profitability of the company at Plaintiff's and Class Members' expense.

220.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members

1    because Defendant's conduct damaged Plaintiff and Class Members, all without providing any

2    commensurate compensation to Plaintiff and Class Members.

3        221.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by

4    Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would

5    be inequitable under unjust enrichment principles in Washington and every other state for Defendant to

6    be permitted to retain any of the profit or other benefits wrongly derived from the unfair and

7    unconscionable methods, acts, and trade practices alleged in this Complaint.

8        222.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff

9    and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief

10   as the Court may deem just and proper.

11                            **<u>COUNT V</u>**
                        **Breach of Fiduciary Duty**
12           **(On behalf of Plaintiff and the National Class)**

13       223.    Plaintiff repeats and re-alleges each and ever allegation contained in the Complaint as if

14   fully set forth herein.

15       224.    A fiduciary relationship involving "every element of trust, confidence, and good faith"[31]

16   existed between Plaintiff and Class Members, and Defendant.

17       225.    Plaintiff and Class members placed Defendant Overlake in a position of trust and

18   confidence by using Defendant's digital platforms to communicate their Private Information, including

19   the specific and sensitive contents of their communications directly with healthcare providers.

20       226.    Defendant Overlake, by accepting payment from Plaintiff and Class Members, by

21   providing treatment and information to Plaintiff and Class Members, accepted and appreciated its

22   responsibility to its patients, including Plaintiff and Class Members.

23       227.    Defendant assumed a duty not to disclose the Private Information provided by Plaintiff

24   and Class Members to any parties not authorized under law or by the informed consent of Plaintiff and

25

26   _____

27   [31] *See Youngs v. Peacehealth*, 179 Wash. 2d 645, 316 P.3d 1035 (2014) (recognizing the "'sanctity' of the doctor-patient relationship" under Washington law and imposing a fiduciary responsibility on healthcare providers) (citing *Loudon v. Mhyre*, 110 Wash. 2d 675, 756 P.2d 138 (1988), *holding modified by Youngs*).

28

Class Members.

228.  Defendant breach the fiduciary duty owed to Plaintiff and Class Members by deliberately configuring the Tracking Tools on its digital platforms to track, record, and transmit patients' Private Information to unauthorized third parties, and thereby failing to act with the utmost good faith, fairness, and honesty, in its dealings with its patients.

229.  Defendant's breach of fiduciary duty is evidenced by its failure to comply with federal and state privacy regulations, including:

a.  By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b.  By failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c.  By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d.  By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members' PHI;

e.  By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.  By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

g.   By impermissibly and improperly using and disclosing Private Information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.* and 45 C.F.R. § 164.508, *et seq.*;

h.   By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.   By failing to comply with R.C. 3798.04, *et seq.*, regarding the use or disclosure of protected health information.

230.     Defendant's breaches of fiduciary duty were a direct and proximate cause of several injuries suffered by Plaintiff and Class Members, including, but not limited to, losses of privacy, interference with confidential relationships, diminished value of Private Information, and the lost benefit of their bargains. Plaintiff and Class Members seek compensatory damages in an amount to be proved at trial. In the alternative, Plaintiff and Class Members seek nominal damages.

<u>COUNT VI</u>
**Violations of Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1) *et seq.***
**Unauthorized Interception, Use, and Disclosure**
**(On Behalf of Plaintiff and the National Class)**

231.     Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

232.     The ECPA protects both sending and receipt of communications.

233.     18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

234.     The transmissions of Plaintiff's Private Information to Defendant via Defendant' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

235.     The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

236.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

237.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

238.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

239.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.  Plaintiff's and Class Members' browsers;

b.  Plaintiff's and Class Members' computing devices;

c.  Defendant's web-servers; and

d.  The Tracking Tools Code deployed by Defendant to effectuate the sending and acquisition of patient communications

240.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

241.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

242.    Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Tools it embedded and operated on its Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

243.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

244.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

245.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

246.    By utilizing and embedding the Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

247.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and

Class Members' Private Information to Facebook.

248.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding Private Information, treatment, medication, and scheduling.

249.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

250.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

251.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

252.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

253.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of HIPAA, breaches of confidence, invasion of privacy, among others.

254.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

255.    Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

256.    Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Washington, including:

    a.   42 U.S.C. § 1320d-6;

b. 45 CFR § 164.508(a)(1);

c. 15 U.S.C. § 45;

d. Wash. Rev. Code Ann. § 7.70 *et seq.*, and

e. The common law causes of action alleged herein.

257.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

258.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

259.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

260.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

261.    The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

262.    Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

263.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their individually-identifiable patient health information on its Website, because it used its participation in these

communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

264.    Defendant accessed, obtained, and disclosed Plaintiff's and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

265.    As such, Defendants cannot viably claim any exception to ECPA liability.

266.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

    b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

    c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members;

    d.    Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

e.   The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

267.   As a result of Defendant's violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VII
### Violations of Wash. Rev. Code Ann. § 7.70 et seq.
### Injury Resulting from Health Care
### (On Behalf of Plaintiff and the National Class)

268.   Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

269.   Plaintiff and Class Members are current and former patients of Defendant.

270.   Defendant is a "health care provider" as defined by Wash. Rev. Code Ann. § 7.70.020.

271.   Defendant caused injuries to Plaintiff and Class Members by departing from the accepted standard of care when it violated federal and state statutory obligations, as well as common law obligations, in installing and configuring Tracking Tools on its digital platforms to record, store, and transmit patient information for the purpose of increasing profitability.

272.   Further, Defendant made assurances to Plaintiff and Class Members that it would not disclose their Private Information, pursuant to HIPAA, unless it was to an authorized party or for some other authorized purpose. Defendant broke these promises when it disclosed Plaintiff's and Class Members' Private Information to unauthorized third parties, such as Facebook, for an unauthorized purpose, increasing Defendant's revenue.

273.   The standard of care for health care providers in the state of Washington requires that health care providers maintain the confidentiality of patient information unless the disclosure is permitted by law or by a patient's informed consent.

274.    Defendant's disclosure of Plaintiff's and Class Members' patient information was not permitted by law and was not authorized by informed consent, as Defendant did not disclose to its patients that it had implemented the Tracking Tools on its digital platforms.

275.    Defendant's departure from the standard of care is the direct and proximate cause of the injuries incurred by Plaintiff and Class Members, as described herein.

## COUNT VIII
### Violations of the Washington Consumer Protection Act,
### Wash. Rev. Code Ann. §§ 19.86.020, *et seq*.
### (On Behalf of Plaintiff and the Class)

276.    Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

277.    Defendant is a "person," as defined by Wash. Rev. Code Ann. § 19.86.010(1).

278.    Defendant advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

279.    Defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, including:

a.    Failing to secure and protect Plaintiff's and the Class Members' Private Information in a confidential manner;

b.    Failing to inform Plaintiff and the Class Members of Defendant's use of the Facebook Pixel and Conversions API tools;

c.    Failing to inform Plaintiff and Class Members of the extent of Defendant's data harvesting, tracking, and disclosure practices;

d.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505, which was a direct and proximate cause of the Data Breach;

e.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and The

Class Members' Private Information, including by implementing and maintaining reasonable security measures;

f.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505;

g.  Misrepresenting that certain sensitive Private Information would not be disclosed to third parties;

h.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Class Members' Private Information; and

i.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, and COPPA, 15 U.S.C. §§ 6501-6505.

280.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's ability and intentions to protect the confidential and sensitive Private Information of Plaintiff and Class Members communicated for the purpose of medical treatment.

281.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff and Class Members, that their Private Information would be held in a secure and confidential manner, rather than deliberately disclosed to third parties.

282.  Defendant acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff's and Class Members' rights.

283.  Defendant's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public interest impact, including, but not limited to Wash. Rev. Code §§ 19.255.010, *et seq.*. Alternatively, Defendant's conduct is injurious to the public interest because it has injured Plaintiff and Class Members, had the

PLAINTIFF'S SECOND AMENDED
COMPLAINT (2:23-CV-01159-TL)                    48

MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700

1    capacity to injure persons, and has the capacity to injure other persons, and has the capacity to injure

2    persons. Further, its conduct affected the public interest, including the thousands of Washington Residents

3    impacted by Defendant's use of the Tracking Tools.

4      284. As a direct and proximate result of Defendant's unfair methods of competition and unfair

5    or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer

6    injury, ascertainable losses of money or property, and monetary and non-monetary damages, including

7    the damage to their privacy and property interests in their Private Information.

8      285. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law,

9    including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

10    **PRAYER FOR RELIEF**

11      **WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against

12    Defendant and that the Court grant the following:

13      A. For an Order certifying the Nationwide Class and appointing Plaintiff and their Counsel

14        to represent such Class;

15      B. For equitable relief enjoining Defendant from engaging in the wrongful conduct

16        complained of herein pertaining to the misuse and/or disclosure of the Private Information

17        of Plaintiff and Class Members;

18      C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and

19        other equitable relief as is necessary to protect the interests of Plaintiff and Class

20        Members:

21      D. For an award of damages, including, but not limited to, actual, consequential, statutory,

22        punitive, and nominal damages, as allowed by law in an amount to be determined;

23      E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

24      F. For prejudgment interest on all amounts awarded; and

25      G. Such other and further relief as this Court may deem just and proper.

26    **<u>DEMAND FOR JURY TRIAL</u>**

27      Plaintiff hereby demands that this matter be tried before a jury.

28

DATE: August 3, 2024

Respectfully submitted,

s/ Terence R. Coates
Terence R. Coates (*pro hac vice*)
Jonathan T. Deters (*pro hac vice*)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 4502
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
jdeters@msdlegal.com

s/Andrew A. Lemmon (by email authority)
Andrew A. Lemmon, WSBA #53034
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
16212 Reitan Road NE
Bainbridge Island, WA 98110
Phone: (985) 783-6789
E-mail: *alemmon@milberg.com*

Gary M. Klinger (*pro hac vice*)
Alexandra M. Honeycutt *
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*
*ahoneycutt@milberg.com*

Joseph M. Lyon (*pro hac vice*)
Clint Watson (*pro hac vice*)
**THE LYON LAW FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*
*cwatson@thelyonfirm.com*

Bryan L. Bleichner *
Philip J. Krzeski *
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401

Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

**Counsel for Plaintiff and the Putative Class**

*Motion for admission *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon counsel for Defendant by electronic mail in accordance with Fed. R. Civ. P. 5(b)(2)(E) this second day of August 2, 2024, as follows:

Alexander Vitruk
James R. Morrison
Logan F. Peppin
Paul Karlsgodt
BAKER & HOSTETLER, LLP
avitruk@bakerlaw.com
jmorrison@bakerlaw.com
lpeppin@bakerlaw.com
pkarlsgodt@bakerlaw.com

s/ Terence R. Coates
Terence R. Coates (*pro hac vice*)